UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LaCESHA BRINTLEY, M.D.,

                    Plaintiff,                    No. 09-cv-14014
                                                Hon. Gerald E. Rosen

vs.

ST. MARY MERCY HOSPITAL,
GILBERT ROC, M.D., LOUIS HALLAL, M.D.,
TALLAL ZENI, M.D., and ASIT GOKLI, M.D.,

                    Defendants.
_____/

OPINION AND ORDER REGARDING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT

At a session of said Court, held in
the U.S. Courthouse, Detroit, Michigan
on _____

PRESENT:   Honorable Gerald E. Rosen
                    United States District Chief Judge

## I. INTRODUCTION

Plaintiff LaCesha Brintley, M.D. commenced this action on October 9, 2009 in

this Court, asserting claims of race and gender discrimination under federal and state law,

and state common law breach of contract and tort claims, against Defendants St. Mary

Mercy Hospital ("SMMH"); Gilbert Roc, M.D., the Chair of SMMH's Department of

Surgery; Asit Gokli, M.D., SMMH's Chief Medical Officer; Louis Hallal, M.D., Chair of

SMMH's Surgical Quality Improvement Committee; and Tallal Zeni, M.D., the Director

1

of Minimally Invasive Bariatric Surgery at SMMH. Plaintiff's various claims in this

action arise from restrictions placed upon, and the ultimate suspension of, her medical

staff privileges at SMMH, decisions made by SMMH's Medical Executive Committee

and upheld by the St. Joseph Mercy Health System Board of Directors in August of 2009,

following a lengthy peer review hearing and appeal process.

After an extended period of discovery, Defendants filed the instant Motion for

Judgment on the Pleadings and/or Summary Judgment.  Plaintiff has responded and

Defendants have replied.  Having thoroughly reviewed and considered the parties' briefs

and supporting documents and the entire record of this matter, the Court has determined

that the pertinent allegations and legal arguments are sufficiently addressed in these

materials and that oral argument would not assist in the resolution of this motion.

Accordingly, the Court will decide Defendants' motion "on the briefs."  See L.R.

7.1(f)(2).  This Opinion and Order sets forth the Court's ruling.

## II.  PERTINENT FACTS

Plaintiff LaCesha Brintley is an African-American medical doctor, board certified

in general surgery.  In October 2006, Dr. Brintley applied for medical staff privileges at

St. Mary Mercy Hospital.  During the application process, Dr. Asit Gokli, Vice President

and Chief Medical Officer of SMMH, discovered that Foote Hospital in Jackson, where

Dr. Brintley previously had privileges, had suspended her.  He discovered that Dr.

Brintley's privileges had been suspended at Foote because "there were a few patients that

2

had excessive bleeding, and there were cholecystectomies where there were leaks." [*See* Gokli testimony, 1/22/09 Peer Review Hearing Transcript Vol. I, Plaintiffs' Ex. 42, p. 66.][1]  The Medical Executive Committee at Foote also had found that Dr. Brintley had communication issues, follow-up issues, and issues with working as a member of a surgical team.  *Id.*

After discussing the matter with Dr. Roc, SMMH's Chief of the Department of Surgery, and Dr. John Dirani, then the Chief of Staff, Dr. Gokli contacted Dr. Brintley to give her an opportunity to explain the situation herself.

Dr. Brintley thereafter met with Dr. Gokli, Dr. Roc, and Dr. Dirani.  According to Dr. Gokli, at this meeting:

> . . . [Dr. Brintley] admitted that she could have done things differently.  She had learned her lesson about communicating with the patients properly, working as a team member, and she also kind of explained that the complications were not out of the ordinary but it was jealousy on the part of the other physicians at Foote Hospital that had led to the MEC acting arbitrarily and capriciously in suspending her.
>
> Based on that, after the meeting occurred -- and also Dr. Brintley had assured us that this would not happen again and she had learned her lesson -- Dr. Roc, Dr. Dirani, and myself, we deliberated for a pretty long time, and decided she was a young, bright -- she came across as a bright young lady.  She was -- we thought she was very honest in communicating with us about what happened at Foote Hospital.  She also mentioned to us

---

[1] SMMH subsequently learned that Dr. Brintley actually had had two patient deaths at Foote Hospital.  After the first death, which resulted from excessive post-operative bleeding, Dr. Brintley's privileges were restricted, and as a corrective action, she was required to undergo proctoring for 20 surgical procedures within 60 days.  [*See* Defendants' Ex. 3.]  When a second patient died after undergoing a laparoscopic cholecystectomy, Dr. Brintley's privileges were suspended.  [*See* Brintley 10/27/10 Dep., Defendants' Ex. 4, p. 77.]

that her salary there guarantee was way too high and when other surgeons
found out what she was making there was professional jealousy that had led
to all these things also.

     So we decided that everybody deserves a second chance and based
on the information, we would bring her into the hospital.

[1/22/09 Hrg. Tr. Vol. I, Plaintiffs' Ex. 42, pp. 66-67].

Based on the information presented by Dr. Brintley and the recommendation of

Drs. Roc, Dirani, and Gokli,  Dr. Brintley's application for medical staff privileges was

approved by the SMMH Credentialing Committee, the Medical Executive Committee

("MEC"), and ultimately, the hospital Board.

<u>PLAINTIFF'S QUALITY OF CARE ISSUES AT SMMH</u>

Dr. Brintley's first year of privileges at SMMH was relatively uneventful.

Although Dr. Gokli, as Chief Medical Officer, testified that he had received some

anecdotal complaints that Dr. Brintley's patient care was not good, he did not initiate any

action because these generally subjective complaints lacked specific information.  *Id.* at

68-69.  Concerns arose about Dr. Brintley's practice, however, when, on January 24,

2008, she performed a laparoscopic appendectomy on an otherwise healthy 22-year-old

woman who presented at SMMH's emergency room the night before with acute

appendicitis.  Dr. Brintley was the surgeon taking emergency call that night.

Dr. Brintley commenced the appendectomy the next morning.  She inserted a

Verres needle and inflated the patient's abdomen.  Then, using the "blind" introduction

technique,[2] she introduced a bladed trocar into the abdomen.  [*See* Brintley testimony, 3/14/09 Hrg. Tr., Plaintiff's Ex. 45, pp. 842-43.]  However, she inserted the trocar in such a fashion that it severed two major blood vessels -- the inferior vena cava and the iliac artery.  *Id.* at 846, 849.  The patient began to hemorrhage profusely.  Dr. Brintley called for another surgeon to assist her.  Fortunately, Dr. Jon Iljas, a vascular surgeon, was prepping for a surgical procedure in a nearby operating room, and he came to assist. *Id.* at 845-46. Once the vascular injuries were located and the patient stabilized,[3] Dr. Iljas was able to repair the trauma.  [*See* Iljas Dep., Defendants' Ex. 12, pp. 14-17.]

After the surgery was completed, however, the patient's abdomen could not be immediately closed due to a risk of excessive swelling caused by the trauma. [3/14/09 Hrg. Tr., Plaintiff's Ex. 45, pp. 852-53.]  She was taken to the Intensive Care Unit and her family was told that she would have to return to surgery to close the abdomen.  *Id.* When informed of the events, the patient's family refused to have Dr. Brintley continue to care for the patient.  [1/22/09 Tr., Plaintiff's Ex. 42, pp. 70-71.]  Dr. Roc, Chair of the Department of Surgery, took over the patient's care.

---

[2]  As Dr. Brintley testified, this meant that she "did not make an incision into the abdominal wall fascia before [she] placed the trocar."  3/14/09 Hrg. Tr., Plaintiff's Ex. 45, p. 842.

[3]  During the course of the vascular repair procedure, the patient required resuscitation several times and the bleeding was so profuse that she required 26 units of blood, and multiple units of platelets, plasma or other blood products.  *See* Roc testimony, 1/22/09 Hrg. Tr., Vol. I, Plaintiff's Ex. 42, pp. 242-43.

CORRECTIVE ACTIONS

Dr. Roc subsequently met with Dr. Brintley to discuss the case and instructed her to stop using the Verres needle and the blind introduction of trocars for laparoscopic procedures.  *Id.* at 247-48.[4]  He further requested that Dr. Brintley take herself off the emergency call list, which she did.  *Id.*  Then, on January 30, 2008, Dr. Roc met with Dr. Gokli and Dr. Roy Misirliyan, who was, at the time, the Chief of Staff and Vice-President of Medical Affairs.  Though they viewed the January 24th surgical incident as an isolated event, because of the magnitude of the injury and other anecdotal concerns about Dr. Brintley's quality of care, they considered whether additional corrective action was warranted.  Dr. Gokli reiterated his position that subjective information should never be acted upon.  1/22/09 Hrg. Tr., p. 72.  Therefore, before taking any further corrective action, they determined that they should ask the hospital's Outcomes Department to conduct a comparison of Dr. Brintley's surgical complication rates to that of other surgeons at SMHH.  *Id.* at 72-73.

Accordingly, they asked SMMH's Outcomes Department to conduct a comparison of complication rates of surgeons during the period of time that Dr. Brintley had been

---

[4]  Although Dr. Roc acknowledged that use of a bladed trocar in laparoscopic procedures is within the standard of care, he testified that most laparoscopic surgeons -- himself included -- never use it, that only Dr.Brintley and one other surgeon who occasionally operated at SMMH used it at the hospital.  1/22/09 Hrg. Tr. pp. 245-47.  He further testified that using a "blunt" trocar is much safer, and that he had no doubt that had Dr. Brintley used a blunt trocar in this case, the injury could have been avoided.  *Id*. at 247.

operating at SMMH, i.e., December 1, 2006 through January 31, 2008.  *Id.*

Debbie Karabatakis, the manager of the Outcomes Department testified that she

first needed to identify similar procedures to the appendectomy performed by Dr.

Brintley to do the comparison.   Because she is a statistician and not a doctor,  she asked

for clinical guidance from Dr. Gokli and from Dr. Mikkilineni, SMMH's Medical

Director of Quality to do so.  *See* Karabatakis Dep., Plaintiff's Ex. 53, p. 9.  The doctors

instructed her to focus on primary surgeons who performed appendectomies or

cholecystectomies.  *Id.*  This meant that she did not include cases in which a principal

surgeon conducted a different procedure on a patient and then a second surgeon came in

and performed the appendectomy. *Id.* She testified that, using the hospital's ICD-9

procedure codes,[5] she first identified all surgeons at SMMH who had performed an

appendectomy or cholecystectomy during the period.   Then, to have a statistically valid

comparison, she compared Dr. Brintley's 104 such procedures to the other surgeons at

SMMH who had performed 30 or more appendectomies or cholecystectomies during the

period. *Id.* at 15.

The comparison was done at two levels.  Ms. Karabatakis testified that first, all of

the procedures were screened using computer logic to cull out those procedures with

additional codes indicating potential complications.  *Id.* at 17-18.  This computer

screening identified procedures with the following complications:  (1) a laceration; (2)

---

[5] ICD-9 codes are diagnosis and procedure codes applied to every inpatient and outpatient record at discharge.  [Karabatakis Dep., p. 8.]

the patient received greater than four units of blood; (3) the patient returned to surgery within 30 days; and (4) the patient was transferred to another facility. *Id*. Then, the medical records of those procedures with potential complications were sent to the Performance Improvement Committee (the "PIC" or "PI Committee") for a full review and a clinical determination as to whether each complication was or was not avoidable. *Id.* at 31.

Drs. Gokli, Roc and Misirliyan preliminarily reviewed the cases identified by the Outcomes Department before they were reviewed by the PI Committee and noted that Dr. Brintley's complication rate appeared to be significantly higher than that of the other surgeons. *See* Gokli testimony, 1/22/09 Hrg. Tr., pp. 73-74.[6] Although normally, pursuant to the Medical Staff Bylaws, the next step would be for the hospital to summarily suspend Dr. Brintley's privileges pending a full review, *id*. at 75, rather than suspend her which would result in a "reportable" action on her record,[7] Drs. Gokli, Roc, and Misirliyan decided to offer Dr. Brintley the option to take a leave of absence until the review was completed. *Id.* Brintley took a leave of absence from February 12 to March 15, 2008. *Id*. at 76.

---

[6] Dr. Brintley's pre-PI review complication rate was 7.69 percent, whereas the overall complication rate for all of the surgeons was 2.19 percent. *See* Karabatakis testimony, 3/12/09 Hrg. Tr., pp. 484-85.

[7] Adverse actions involving a physician's privileges are reportable to the National Practitioner Data Bank. 42 U.S.C. § 11133. Such negative reports can be obtained and reviewed by other hospitals in deciding whether to grant a physician clinical privileges.

Meanwhile the PI Committee reviewed all of the procedures that had been computer screened for review as to whether or not the complications identified were probably or possibly avoidable. *Id.* Drs. Roc and Hallal thereafter also reviewed the cases to ensure the accuracy of the PIC review. *Id.* Roc testimony, pp. 261-62. The post-physician review findings were then submitted to Ms. Karabatakis for final statistical comparison. Karabatakis testimony, 3/12/09 Hrg. Tr., pp. 483-84.

The comparison showed that during the 14-month period of time that Dr. Brintley had been on staff, she had six cases that involved probably or possibly avoidable surgical complications. Of the other nine surgeons in the SMMH Department of Surgery, one had one such complication and the remainder of surgeons had none. Statistically, this translated into a complication rate of 5.77% for Dr. Brintley compared to 1.18% for the entire department. *Id.* at 487.[8]

PLAINTIFF'S PROCTORSHIP AND THE ULTIMATE SUSPENSION OF HER PRIVILEGES AT SMMH

Dr. Roc reviewed the PI Committee's findings, and on March 11, 2008, submitted his report, as Chair of the Department of Surgery, to the Medical Executive Committee

---

[8] Dr. Brintley argued at the Peer Review Hearing and argues again, here, that this statistical comparison should be viewed and considered with skepticism because it was not "risk-adjusted" to reflect that Dr. Brintley had a higher volume of emergency room cases when compared to other surgeons at SMMH and that ER cases have an expected higher complication rate due to the advanced ages of the patients and numerous co-morbidities presented. Brintley was afforded the opportunity and, in fact, did present evidence supporting these arguments at the Peer Review Hearing. *See* Hrg. Tr., pp. 654, 720, 754-55, 805-07.

("MEC") with his recommendations concerning Dr. Brintley's privileges.  *See* Defendants' Ex. 17.  Dr. Roc recommended that Dr. Brintley undergo proctorship for 10 laparoscopic and 10 open laparotomy surgeries, proctored by no more than three surgeons designated by the Chair of Surgery.  *Id.*

The MEC considered Dr. Roc's report and recommendations and made its own recommendation to the St. Joseph Mercy Hospital System Board.  The MEC recommended that Dr. Brintley undergo proctorship for a *minimum* of 10 laparoscopies and 10 laparotomies, and that the proctorship end "if, and as appropriate, as determined by the MEC."  Defendants' Ex. 18.

Dr. Brintley requested an appeal of the MEC decision under the Medical Staff Bylaws, but also requested that she be allowed to continue to perform surgeries, subject to the proctorship requirements.  *See* 1/22/09 Hrg. Tr., Roc testimony, pp. 263-64. Although the MEC could have refused this request and required Dr. Brintley to complete the hearing and appeal process under the Medical Staff Bylaws before implementing the recommendations, the MEC accommodated Brintley's request.  *Id.*  Dr. Brintley subsequently sought clarification of proctorship requirements which the MEC provided on May 14 and September 10, 2008.

On May 14, 2008, the MEC provided Plaintiff the following clarification of the proctorship requirements:

> We also understand that you seek clarifications of certain aspects of the recommendation for restriction of your privileges.  As you know, the

restrictions specified in the March 14, 2008 correspondence involved, among other things, proctorship of a minimum of the first ten laparoscopic and first ten laparotomy surgeries. As indicated, the proctorship includes the selection of cases as well as supervision of the surgical procedures. As for selection of cases, you must review the case with (making the chart available to the proctor) and obtain the proctor's prior approval for any laparoscopic or laparotomy procedure you propose to undertake. Without such prior approval, you cannot schedule or perform the procedure. As to performing the procedure, you must secure the proctor's agreement to assist in the case. The proctor must be present during the procedure to assist in the same, and will have the authority to intervene and perform any aspect of the procedure at the proctor's sole discretion. The proctor will complete an evaluation of each case, assessing your selection of procedures, your judgment, efficiency and skills.

The process will remain in place for a minimum of the first ten of each of types of procedures specified above, and will not end, if and as appropriate, as determined by the MEC. The responsibility to secure a proctor will be entirely yours. The MEC has approved three physicians who may act as a proctor for your cases: Dr. Gilbert Roc, Dr. Louis Hallal, and Dr. Tallal Zeni. If you are unable to secure one of these three physicians to proctor your selection and performance of a particular surgical procedure, you will not be able to undertake the same.

*See* Plaintiff's Ex. 14.

On September 10, 2008, the MEC reiterated the requirements:

As you know, a proctor by the very definition of the term, is a supervisor. Your attorney requested clarification of the degree of supervision involved in the recommended limitation, and Dr. Gokli provided the clarification directly to you in correspondence dated May 14, 2008. As mentioned in that correspondence, the proctor, among other things, has the authority to intervene in your performance of any case. You are not and will not be entitled to prevent any such intervention or to otherwise disregard the proctor's directives or other supervision during the procedures.

* * *

The MEC adopted the proctorship requirements to protect and safeguard

11

patient health and well-being in the hospital.  Any failure by you to strictly abide by all of the requirements and terms specified by this and the hospital's previous correspondence subjects you to possible summary suspension and other adverse action under the Medical Staff Bylaws.

[Defendants' Ex. 21]

Despite these clear directives, Dr. Brintley refused to follow the direction of the proctors, and according to them, was arrogant and, at times, exhibited inappropriate conduct.  *See* Defendants' Ex. 19; *see also* Hallal Dep., Plaintiff's Ex. 47, p. 59.  As recorded by Dr. Roc, there were at least three instances when Dr. Brintley failed to request a proctor prior to a procedure, as she was required to do.  *See* Defendants' Ex. 19. In a case proctored by Dr. Roc, Dr. Brintley challenged Roc's request to dim the lights so that the video monitor would be clearer to the surgical team.  Dr. Brintley responded, "I am the surgeon here, I want the OR lights bright."  *See* Defendants' Ex. 23.  In another incident, Dr. Brintley added an addendum to a patient's medical record almost a month after the procedure, accusing the proctor, Dr. Hallal, of improperly handling the patient. In the addendum, she wrote that Dr. Hallal "manipulated the anastomosis, unsolicited in a way which I would not do and was not trained to do and I then asked Dr. Hallal to remove his hands away from the anastomosis."  *See* Hallal Dep., Plaintiffs' Ex. 47, pp. 58-60.

Matters came to a head on August 2, 2008 when Dr. Zeni was proctoring a laparoscopic procedure.  During the procedure, Dr. Zeni was required to intervene when Dr. Brintley failed to make a proper entry into the patient's abdominal cavity and asked

12

for a sharp trocar.  *See* Defendants' Ex. 19; *see also* 3/13/09 Hrg. Tr., Zeni testimony, pp. 579-84.  According to Dr. Zeni, had he not intervened, Dr. Brintley would have performed a blind insertion of the trocar (in direct contravention of Dr. Roc's February 2008 directive).  *See id.*  Dr. Zeni testified that Dr. Brintley defied his directions, became argumentative, and told him, "You are not here to tell me how to operate."  *Id.*  Dr. Zeni was required to open the patient's abdominal cavity so that the procedure could be properly performed.  *Id.*[9]

The August 2, 2008 procedure was the subject of a PEERs report[10] generated by the circulating nurse, Anita Bara Caeti.  Ms. Caeti reported multiple concerns during the procedure including Dr. Brintley requesting a surgical instrument before the proctor arrived, her refusal to follow Dr. Zeni's directive for her to wait for him to finish scrubbing before beginning the procedure, failing to observe the surgical time-out protocol, and her becoming argumentative toward Dr. Zeni during the procedure.  *See* Defendants' Ex. 25.  Ms. Caeti stated that the events "caused tremendous stress on the surgical team" and "great concern for the well being and safety of the patient."  *Id.*  Dr.

---

[9]  Dr. Brintley claims that Dr. Zeni became critical of her after a case of hers that he proctored early on, after which the two got into a dispute as to whether cecal tissue had been removed by Dr. Brintley during her transection of an appendix.  Dr. Brintley asked Dr. Roc to remove Dr. Zeni as one of her proctors after that procedure, but Dr. Roc refused.  Dr. Brintley thinks that word must have gotten back to Dr. Zeni about her request that he be removed as a proctor and after that he became critical of her performance.

[10]  A PEERs report is an internal SMMH report which allows a member of the health care team to confidentially report issues of concern to the administration.

Roc investigated the PEERs report and met with all of the members of the surgical team individually. 1/22/09 Hrg. Tr., Roc testimony, pp. 274-76. Each of the surgical team members corroborated Nurse Caeti's report. *Id.*

After the August 2, 2008 incident, both Dr. Zeni and Dr. Hallal informed Dr. Roc that they were withdrawing from Dr. Brintley's proctorship due to her clinical deficiencies and her refusal to comport with the requirements of the proctorship. *Id.* at p. 267.

Dr. Roc subsequently submitted a report to the MEC which detailed the issues that arose during Dr. Brintley's proctoring. Based on his investigation and the detailed report of the problems and issues that arose during her proctoring, Dr. Roc recommended that Dr. Brintley's clinical privileges at SMMH be suspended.

The MEC voted to summarily suspend Dr. Brintley's privileges at its October 13, 2008 meeting. The MEC informed Dr. Brintley of its decision on October 14, 2008. *See* Defendants' Ex. 27. Brintley requested a special meeting of the MEC to review the suspension, pursuant to the Bylaws, and a meeting was held pursuant to her request on October 24, 2008. *See* Defendants' Ex. 25; *see also* 3/12/09 Hrg. Tr., pp. 292-93. Dr. Brintley attended the meeting and presented her own position statement to the MEC. *See* Defendants' Ex. 28. Following this special meeting, the MEC upheld its decision to suspend Dr. Brintley's privileges. *Id.*

PEER REVIEW HEARING

14

Pursuant to the SMMH Medical Staff Bylaws, Dr. Brintley requested, and was granted, a Peer Review Hearing to review the decision to require her to undergo proctoring and the ultimate suspension of her clinical privileges at SMMH.  The Peer Review Hearing was held over four days -- January 22, and March 12, 13, and 14, 2009. Dr. Brintley was represented by counsel, called witnesses on her own behalf, and cross-examined witnesses called on behalf of the MEC.  The Peer Review panel was comprised of five physicians, none of whom were in direct competition with Brintley.

In addition to the SMMH doctors and staff members who testified as indicated above, Dr. Robert Jury, the Chair of the Department of General Surgery at William Beaumont Hospital, also testified at the hearing.  Dr. Jury reviewed the identified cases of Dr. Brintley.  He found that these cases raised serious quality concerns about Dr. Brintley's patient care.  He summarized his review as follows:

> Following review of the aforementioned cases performed by Dr. LaCesha Brintley, I can fully support the actions of medical leadership in recommending remediation and quality improvement procedures.  While many of the complications observed are minor and within the standards of practice, significant major complications occurred related to surgical judgment and techniques of surgery.  Several minor complications are considered to be expected and acceptable as isolated events however a pattern of occurrence seems apparent.  I believe the decision to restrict privileges to a proctored environment is reasonable and appropriate. Careful ongoing performance review is clearly warranted.

*See* Jury Report, Defendants' Ex. 29 and testimony 3/12/09 Hrg. Tr., p. 435.

Dr. Brintley's own expert, Dr. A.J. Telmos, who taught Dr. Brintley general surgery agreed with Dr. Jury:

15

I can't disagree with that decision because I read Dr. Jury's -- who I have great respect for, his opinion, and my opinion as chief would be the same. If this was brought to me and there was a continuing pattern, let's say, pattern of even minor injuries, certainly I wouldn't be against proctoring that particular surgeon to make sure that they were following the standard guidelines. . . . I certainly thought there was a pattern developing here and I certainly do not disagree with his [Dr. Jury's] opinion that to undergo a period of observation for this particular surgeon on a certain number of case was certainly warranted.

Q:    . . . So you agreed with his [Dr. Jury's] judgment in that regard that proctorship would be warranted in this instance?

A:    I did.

3/12/09 Hrg. Tr., pp. 731-32.

Dr. Telmos further testified that a physician being proctored should "bend over backwards" to comply with the directives of his or her proctor.  *Id.* at 732-33.

After the conclusion of the Peer Review Hearing, the panel recommended that Dr. Brintley's suspension be upheld.  *See* Defendants' Ex. 37.  After an appeal to the St. Joseph Mercy Health System Board, on July 21, 2009, the Board voted to uphold the suspension (and the previous recommendation to restrict Brintley's privileges).  *See* Defendants' Ex. 30.

Dr. Brintley thereafter filed an EEOC charge of race and sex discrimination and on the same day requested, and was issued, a Right to Sue letter.  *See* Plaintiff's Ex. 1. On October 9, 2009, Dr. Brintley initiated this lawsuit.

In her 11-count Complaint, Dr. Brintley alleges claims of gender discrimination in violation of Title VII of the Civil Rights Act of 1964 (Count 1), 42 U.S.C. § 1981 (Count

16

2), and the Michigan Elliott-Larsen Civil Rights Act (Count 7); race discrimination in violation of Title VII (Count 3), Section 1981 (Count 4) and the Elliott-Larsen Civil Rights Act (Count 6); civil conspiracy (Count 5); tortious interference with business relations (Count 8); breach of contract (Count 9); violation of public policy (Count 10) and negligence (Count 11). Defendants now seek entry of judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c) and/or summary judgment pursuant to Rule 56 on all counts in Plaintiff's Complaint.

### III. DISCUSSION

A.    APPLICABLE STANDARDS

Because Defendants have presented matters outside the pleadings for the Court's consideration, the Court will treat Defendants' motion in its entirety as one for summary judgment. *See Max Arnold & Sons, L.L.C. v. W.L. Hailey & Co., Inc.,* 452 F.3d 494, 503 (6th Cir. 2006)

Summary judgment is proper if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). As the Supreme Court has explained, "the plain language of Rule 56[] mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S. Ct.

2548, 2552 (1986).

In deciding a motion brought under Rule 56, the Court must view the evidence in a light most favorable to the nonmoving party. *Pack v. Damon Corp.,* 434 F.3d 810, 813 (6th Cir. 2006). Yet, the nonmoving party may not rely on mere allegations or denials, but must "cit[e] to particular parts of materials in the record" as establishing that one or more material facts are "genuinely disputed." Fed. R. Civ. P. 56(c)(1). But in so doing, the respondent must "do more than simply show that there is some metaphysical doubt as to the material facts." *Betkerur v. Aultman Hospital Association*, 78 F.3d 1079, 1087 (6th Cir. 1996) (citing *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989) (footnotes with citations omitted)). The trial court has at least some discretion to determine whether the respondent's claim is plausible. *Id.* Moreover, any supporting or opposing affidavits or declarations "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). Finally, "the mere existence of a scintilla of evidence that supports the nonmoving party's claims is insufficient to defeat summary judgment." *Pack,* 434 F.3d at 814 (alteration, internal quotation marks, and citation omitted). "[W]here the record taken as a whole could not lead a rational trier of fact to find" for the respondent, the motion should be granted. *Betkerur, supra*. The Court will apply these standards in deciding Defendants' Motion in this case.

## B.   PLAINTIFF HAS FAILED TO STATE A LEGALLY COGNIZABLE TITLE VII CLAIM

In Counts I and III of her Complaint, Plaintiff alleges that in restricting and subsequently terminating her medical staff privileges at SMMH, Defendants discriminated against her based on her sex and her race in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*.  Under Title VII, it is "an unlawful employment practice. . . to discriminate against any individual with respect to his compensation, terms, conditions or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a).  It is well-settled, however, that to make out a claim for relief under Title VII, it must be shown that there existed an employer-employee relationship between the plaintiff and the defendant.  *See Shah v. Deaconess Hospital*, 355 F.3d 496 (6th Cir. 2004).

In *Shah*, the Sixth Circuit affirmed the dismissal of a physician's  Title VII and ADEA claims against a hospital that were predicated upon the hospital's termination of his surgical privileges at the hospital, finding that the physician was not an employee of the hospital and, therefore, had no rights under the federal employment discrimination statutes.  In reaching this conclusion, the Sixth Circuit applied the common law agency test to determine whether the doctor was an employee or an independent contractor,[11] and explained:

> [T]the common law agency analysis requires the consideration of numerous factors including:

---

[11]  "As a general rule, the federal employment discrimination statutes protect employees, but not independent contractors."  *Shah*, 355 F.3de at 499 (collecting cases).

19

> the hiring party's right to control the manner and means by
> which the product is accomplished; the skill required by the
> hired party; the duration of the relationship between the
> parties; the hiring party's right to assign additional projects;
> the hired party's discretion over when and how to work; the
> method of payment; the hired party's role in hiring and
> paying assistants; whether the work is part of the hiring
> party's regular business; the hired party's employee benefits;
> and tax treatment of the hired party's compensation.

355 F.3d at 499.

However, no one factor is decisive. *Simpson v. Ernst & Young,* 100 F.3d 436, 443

(6th Cir. 1996).

Turning to this case, Dr. Brintley was never an employee of SMMH. She never

had any kind of employment agreement or contract with SMMH. Indeed, she admitted

that, during the period of time from 2006 through 2008, she was "self-employed." *See*

Brintley Dep., Defendants' Ex. 4, pp. 18, 20, 23. Plaintiff never received any wages or

any W-2 from SMMH. *Id.* at p. 25. At all times relevant to this action, she was a

"private practice general surgeon" and the sole-proprietor of her own medical practice,

"LaCesha Brintley, M.D., P.L.L.C." *Id.* at pp. 6, 21. Dr. Brintley hired and paid her own

employees. *Id.* at pp. 16, 19. She paid all of her own professional dues, licensing fees,

and malpractice insurance premiums, and paid for her own health care insurance. *Id.* at

28-30. Her tax returns for years 2005 through 2008 indicate that she is self-employed.

*See* Defendants' Ex. 31. Brintley did her own billing and collection of payments for all

of her professional services, including the services she provided at SMMH. Brintley

20

Dep., pp. 27, 28.

Further, to the extent that Dr. Brintley relies upon the Medical Staff Bylaws to establish a contract of employment, Plaintiff unilaterally agreed to be bound by the Bylaws. *See* Defendants' Ex. 33, Acknowledgment.[12]  There is no signature on behalf of the Hospital. *Id*.  Further, nothing in the Bylaws themselves supports a claim that the Bylaws constitute a contract of employment with SMMH.  Indeed, if that were the case, Article VI of the Bylaws which sets forth the various "Categories of the Medical Staff," and the various provisions and rules differentiating between medical staff members who merely have clinical privileges, *see* Bylaws, Defendants' Ex. 33, §§ 6.1 - 6.7, and those who are "Contractual Physicians," i.e., those who have a "contract with the Hospital" or with an "entity that contracts with the Hospital," *see* Bylaws § 6.8, would be superfluous.[13]  Moreover, there is no evidence extrinsic of the Bylaws to show an intent

---

[12]  The Acknowledgment Plaintiff signed states:

I acknowledge receipt of a copy of the Bylaws, Rules and Regulations of the Medical Staff of St. Mary Mercy Hospital, which outline my privileges and obligations as a member of the Medical Staff, Allied Health Professional or House Physician.

I have studied the contents carefully and agree to abide by them.

  s/ LaCesha Brintley, M.D.

[13]  Section 6.8 provides, in pertinent part, as follows:

6.8.1   Contractual Practitioners shall obtain and maintain clinical privileges and, if applicable, Medical Staff membership, in the same manner as non-contractual practitioners. . . .

on the part of the Hospital to be contractually bound by the Bylaws.  *Contrast, Ritten v. Lapeer Regional Medical Center*, 611 F. Supp. 2d 696 (E.D. Mich. 2009), where the Chair of the Hospital Board of Trustees testified that the Bylaws are binding on the Board and the medical staff alike.  *Id.* at 735.

As explicitly stated in the Preamble, the Medical Staff Bylaws provide for the self-organization and self-governance of the Medical Staff:

> WHEREAS, it is recognized that under the ultimate authority of the Board of Trustees, the Medical Staff is granted responsibility for the quality and appropriateness of care furnished in the Hospital; and

> WHEREAS, the Medical Staff has the duty to recommend to the Board of Trustees those practitioners who should be appointed or reappointed to the Medical Staff, as well as those who should be granted initial or renewed clinical privileges,

---

6.8.2   Continuation of a Contractual Practitioner's clinical privileges and, if applicable, his Medical Staff membership, is dependent on continuation of the contract with the Hospital or the Practitioner's association with the entity that contracts with the Hospital, unless otherwise stated in the contract.  A Contractual Practitioner is entitled to hearing and appeal rights pursuant to Article VIII only with respect to adverse actions that are based on the Practitioner's professional or clinical performance relating directly to patient care, and then only if the Practitioner has not waived such rights by contract.

Bylaws, Defendants' Ex. 33, §§ 6.8.1 - 6.8.2.  *See also*, Definitions 11 and 12, at Ex. 33, pp. 5-6, defining "clinical privileges" or "privileges" as "authorization granted by the Board of Trustees to a practitioner to provide specific care, treatment and services to patients in the Hospital," and defining "contractual practitioners" as "practitioners who provide services at the  Hospital pursuant to a contract between the practitioner and the Hospital or on behalf of an entity that contracts with the Hospital."

THEREFORE, **in order to discharge these duties and responsibilities, the physicians, dentists and podiatrists practicing in this Hospital are hereby organized into a Medical Staff in conformity with the following Bylaws**, and the Bylaws of St. Mary Mercy Hospital.

*See* Defendants' Ex. 33, Preamble, p. 4 (emphasis added). *See also* Article II,

"Purposes";

The purpose of this organization [the Medical Staff of St. Mary Mercy Hospital][14] shall be:

2.1   To provide patients in any of the facilities of the Hospital with quality care;

2.2   **To make recommendations** to the Board of Trustees regarding all requests for Medical Staff appointment and reappointment and initial and renewed clinical privileges;

2.3   To conduct and support appropriate continuing medical educational programs designed to advance professional competence, knowledge, and skills;

2.4   **To initiate and enforce rules of self-governance of the Medical Staff** in accordance with the Bylaws of the Hospital;

2.5   To provide a mechanism whereby issues of common interest may be discussed among the Medical Staff, the Administration and the Board of Trustees;

2.6   **To evaluate the appropriateness of care**, cost effectiveness, and the changing health care needs of the community, based on new or changing medical technology, and to devise and recommend to the Administration and the Board of Trustees strategies to fill these needs.

---

[14]   Article I of the Bylaws provides that "The name of this organization shall be the Medical Staff of St. Mary Mercy Hospital."

Defendants' Ex. 33, p. 7.

As indicated, the Bylaws provide for the Medical Staff to make *recommendations* to the Hospital Board of Trustees regarding the continuation of clinical privileges. *See* Art. II, § 2.2; *see also* Art. VII, § 7.1.2.4.2 (after investigating a complaint/request for corrective action the Medical Executive Board[15] may "*recommend* to the Board of Trustees reduction, limitation, suspension or revocation of clinical privileges. . . [and] any other form of discipline . . . such as requiring proctoring or consultation, with the consent of the proctor or consultant being required before patient care may be provided.") As evident from the foregoing, nothing in the Bylaws *requires* or binds the Board of Trustees to take any action.

Dr. Brintley contends, however, that SMMH had the right to control her work, and that this "right to control" establishes an employer-employee relationship with the hospital. In support of this contention, she points to the SMMH Medical Staff Bylaws and the proctorship restrictions placed on her surgical practice at the hospital pursuant to the corrective action provisions of the Bylaws.

Courts that have considered this argument in the context of physicians and medical staff bylaws and rules have uniformly rejected it. *See Cilecek v. Inova Health System Services*, 115 F.3d 256 (4th Cir.1997), *cert. denied*, 522 U.S. 1049 (1998); *Shah v. Deaconess Hospital*, 355 F.3d 496 (6th Cir. 2004); *Wojewski v Rapid City Regional*

---

[15]  The voting members of the Medical Executive Board are all members of the Medical Staff.  *See* Art. XII, § 12.6.

24

*Hosp., Inc.*, 450 F3d 338, 341(8th Cir. 2006); *see also*, *Alexander v. Rush N. Shore Med. Ctr.,*, 101 F.3d 487 (7th Cir. 1996), *cert. denied*, 522 U.S. 811 (1997); *Diggs v. Harris Hosp. - Methodist, Inc.*, 847 F.2d 270 (5th Cir. 1988).  *Cf, Salamon v. Our Lady of Victory Hosp.*, 514 F.3d 217 (2d Cir. 2008) (agreeing that hospital policies that merely reflect professional or governmental regulatory standards may not typically impose the kind of control that establishes an employer-employee relationship but finding that  "a reasonable fact-finder could conclude from the present record that the quality assurance standards extended beyond mere health and safety concerns or ensuring Salamon's qualifications" such that summary judgment was not proper on the issue of whether the plaintiff was a hospital employee or an independent contractor.)

For example, in *Wojewski v. Rapid City Regional Hosp.*, the plaintiff, a doctor who had staff privileges at the defendant-hospital, took a leave of absence for treatment of a medical condition.  The hospital subsequently conditionally reinstated the doctor's privileges on a limited basis and subject to certain conditions, including the requirement that he meet periodically with a monitoring physician; meet with certain medical officers upon demand; limit the time he was on call; submit to mental, physical or medical competency examinations demanded of him; submit to review of 100% of his surgical cases for a period of six months from the date of reinstatement; and submit to a formal proctorship of his clinic and hospital practice. 450 F.3d at 343-44.

The doctor subsequently brought suit against the hospital arguing that in

25

restricting his staff privileges, the hospital discriminated against him in violation of the Americans with Disabilities Act.  The hospital moved for summary judgment arguing that the doctor had no standing to sue under the ADA because he was not a hospital employee.  In opposing the defendant's motion, the plaintiff argued that the hospital exercised a heightened level of control over Dr. Wojewski to such an extent that he was an employee for ADA purposes.

The district court rejected the plaintiff's argument, and the Eighth Circuit affirmed.  In so doing, the appellate court relied on the Fourth Circuit's decision in *Cilecek v. Inova Health System Services*, *supra*, in which the court similarly found insufficient indicia of control in the peer review and corrective action taken by the hospital pursuant to medical staff bylaws in the case of a doctor who had contracted with an corporation that agreed to staff emergency rooms at several Northern Virginia hospitals.

The plaintiff-doctor in *Cilecek* argued that the hospital where he was placed exercised control over the manner and means of his practice such that he should be treated as a hospital employee for purposes of his Title VII discrimination action.  In support, he pointed to the medical staff bylaws which provided a mechanism for peer review and corrective action with respect to physicians whose practices did not meet the hospital's standards.

In determining that *Cilecek* was an independent contractor and not a hospital

employee, the Fourth Circuit explained:

> At root, the distinction at common law between an employee and an independent contractor rests on the degree of control exercised by the hiring party. An employer controls the work and its instrumentalities and circumstances to a greater degree than does a hiring party in an independent contractor relationship. *See* Restatement (Second) of Agency §§ 2 & 220(2). **But the degree of distinction between the two is related to the work itself and the industry in which it is performed. Thus, for example, the ultimate control of doctors performing work at hospitals results from a competition for control that is inherent in the duty of each to discharge properly its professional responsibility. A doctor must have direct control to make decisions for providing medical care, but the hospital must assert a degree of conflicting control over every doctor's work -- whether an employee, an independent contractor, or a doctor merely with privileges -- to discharge its own professional responsibility to patients. Consequently, it is less productive to debate the control over the discharge of professional services in the medical context than it might be in other service relationships**.

115 F.3d at 260 (some citations omitted and emphasis added).

The *Cilecek* court nonetheless examined the regulations and bylaws upon which

the plaintiff relied as evidence of control and determined:

> All of these regulations, however, relate to the professional standard for providing health care to patients for which both Emergency Physicians and the Inova hospitals had professional responsibility to their patients. While Cilecek certainly retained a professional independence in performing professional services, he also shared a professional responsibility to cooperate with the hospitals to maintain standards of patient care, to keep appropriate records, and to follow established procedures. ***This shared control exists both for employee doctors and for doctors merely enjoying practice privileges at a facility***. If the hospitals did not insist on such details in the performance of professional services by doctors at their facilities, they would be exposing themselves to recognized professional liability. Because of the overarching demands of the medical profession, the tension in professional control between doctors and hospitals for medical services rendered at hospitals is not, we believe, a reliable indicator of whether the doctor is an employee or an independent contractor at the hospital.

27

*Id.* (Emphasis added).

These same principles persuaded the Sixth Circuit to reject the plaintiff-physician's "employee" argument in *Shah v. Deaconess Hospital*, 355 F.3d 496 (6th Cir. 2004), a case in which the plaintiff sought relief pursuant to Title VII, the ADEA and the Ohio civil rights statute.[16]

The plaintiff in *Shah* was a surgeon with staff privileges at Deaconess Hospital in Cincinnati, Ohio, and as such, was subject to various written hospital rules, regulations, and bylaws, including provisions for peer review and corrective action. After the death of a patient following one of his surgical procedures, Shah was subjected to peer review proceedings which ultimately resulted in restrictions being placed on his surgical privileges: He was placed on a one-year monitoring and focus review of his hospital care and restricted from performing head and neck surgeries at Deaconess. Shah argued that his having been subjected to peer review and monitoring, and restrictions having been placed on his surgeries demonstrated that the hospital exercised control over his work such that he should be considered an employee of the hospital, and accordingly, entitled to pursue his federal and state employment discrimination claims.

The Sixth Circuit found insufficient indicia of employer control, and rejected Shah's argument. The court explained:

---

[16] For a detailed recitation of the pertinent facts in *Shah*, see the district court's order granting the defendant's motion for summary judgment. *Shah v. Deaconess Hospital*, S.D. Ohio No. 00-00178, 12/4/01 Order, Dkt. # 35.

There is no evidence that Deaconess has a right to control the manner and means of Shah's performance.  **Although the hospital requires all physicians having surgical privileges to abide by the applicable standard of care,** *this requirement applies regardless of employment status* **and is enforced only after-the-fact, through the peer review process**.

355 F.3d at 500 (emphasis added).

The court then proceeded to examine the record and observed:

By Shah's own admission, he treats his own patients and contracts freely with other hospitals.  There is no evidence that Shah must accept patients referred to him by the hospital, and as far as the record discloses, Deaconess does not dictate Shah's hours or hire and pay Shah's assistants.  As Shah testified at his deposition, he receives no payment from Deaconess and is not treated as an employee for tax purposes.  Thus, there is no proof of the existence of an employment relationship between Shah and Deaconess.

*Id.*

Similarly, in *Savas v. William Beaumont Hospital* 216 F. Supp. 2d 660 (E.D. Mich. 2002), *aff'd*, 102 Fed. App'x 447 (6th Cir. 2004), a physician's clinical privileges at Beaumont Hospital were terminated following an extensive investigation and peer review proceedings.  The physician thereafter filed suit claiming gender discrimination and retaliation in violation of Title VII and the Michigan Elliott-Larsen Civil Rights Act.  The district court determined that the plaintiff was not an employee within the meaning of Title VII or the Elliott-Larsen Act, 216 F. Supp. 2d at 667, and the Court of Appeals affirmed.  102 Fed. App'x at 450.  In so doing, the court considered the plaintiff-physician's own testimony in which she stated that she was not an employee of the

29

hospital and also noted that the physician was the sole director of her own medical practice, "Vicky Savas, M.D., P.C.", that all of her revenue was derived directly from her patients and/or her patients' health insurance.  216 F.2d at 663.  She did not receive any paychecks or a W-2 form from Beaumont, and Beaumont did not pay her social security taxes, unemployment taxes or income taxes, nor did the hospital pay her professional licensing fees, dues, or insurance premiums.  *Id.* The court placed no weight on the fact that the hospital had standards, peer review and regulations governing the performance of doctors or that it was following these procedures that Dr. Savas's privileges were terminated.  *Savas*, 102 Fed. App'x at 449-50.

These same factors convince this Court that Plaintiff Brintley was not an employee of St. Mary Mercy Hospital. She never received any wages or any W-2 from SMMH. Further, Dr. Brintley admitted in her deposition that she was "self-employed," and her tax returns for years 2005 through 2008 also indicate that she was self-employed.  She was a "private practice general surgeon" and the sole-proprietor of her own medical practice, "LaCesha Brintley, M.D., P.L.L.C."   Dr. Brintley hired and paid her own employees, and she paid all of her own professional dues, licensing fees, and malpractice insurance premiums, and paid for her own health care insurance.  Brintley did her own billing and collection of payments for all of her professional services, including the services she provided at SMMH.  And, just as the courts in *Savas, Shah,* and *Cilecek* found, the fact that Brintley was subjected to corrective action, including proctoring, pursuant to the

30

Medical Staff Bylaws does not alter the Court's conclusion that Brintley was not an employee of SMMH.  The Bylaws and the corrective action procedures thereunder are applicable to employee physicians (i.e., house physicians and contract physicians) as well as physicians, who like Plaintiff, merely enjoy practice privileges at SMMH.  Therefore, being subjected to such corrective action procedures does not establish that Plaintiff was an employee of SMMH.

Having failed to establish that she was an employee of SMMH, Plaintiff cannot maintain an action under Title VII.  Therefore, Defendants are entitled to summary judgment as a matter of law on Counts I and III of Plaintiff's Complaint.

C.   PLAINTIFF'S CLAIM OF GENDER DISCRIMINATION IS NOT COGNIZABLE UNDER 42 U.S.C. § 1981

In Count II of her Complaint, Plaintiff alleges a claim of gender discrimination in violation of 42 U.S.C. § 1981.  However, "[i]t is well-settled that § 1981 redresses only racial discrimination."  *Ana Leon T. v. Fed. Res. Bank of Chicago*, 823 F.2d 928, 931 (6th Cir.), *cert. denied*, 484 U.S. 945 (1987) (internal citations omitted); *see also Jones v. Continental Corp*, 789 F.2d 1229,1231 (6th Cir. 1986) ("[F]ederal law is quite clear that § 1981 prohibits only race discrimination, not sex discrimination.") (citing *Runyon v. McCrary*, 427 U.S. 160, 96 S.Ct. 2586, 49 L.Ed.2d 415 (1976)).  Plaintiff's claim of gender discrimination under § 1981, therefore, is not legally cognizable and Defendants are entitled to judgment as a matter of law on Count II.

D.   PLAINTIFF DID NOT HAVE A CONTRACT WITH SMMH

Plaintiff's breach of contract claim in Count IX is based on alleged "expressed and/or implied contractual rights set forth within the SMMH Bylaws."   As with her claim of employment by the hospital, Plaintiff does not point to any "contract" *per se* with SMMH but instead here points to (1) the "Delineation of Privileges" form that she filled out on October 18, 2006, requesting surgical privileges for the procedures indicated on the form, which the Chairs of the Surgery Department, the Credentialing Committee, the MEC, the Physician Relations Committee, and the Executive Committee of SMMH's Board of Trustees subsequently signed indicating their approval of her request for surgical privileges to perform the procedures Plaintiff requested [Defendants' Ex. 32]; (2) a letter from the hospital administrator informing her that she had been granted full privileges at SMMH, subject to the Bylaws; and (3) the Medical Staff Bylaws themselves.  *See* Brintley Dep., pp. 53-54.

First, the signatures of the various members of the medical staff on the Delineation of Privileges sheet merely are indicative of the staff members' recommendation and the hospital's approval for Plaintiff to use its facilities to admit her patients for the specific, delineated procedures that she requested.  [*See* Defendants' Ex. 32; *see also* Bylaws, Defendants' Ex. 33, § 4.4.1.]  There is nothing in this document indicative of any intent on the part of the hospital to create a contract with Plaintiff.[17]  As for the Bylaws, and the

---

[17]  A valid contract requires parties competent to contract, a proper subject matter, legal consideration, and mutuality of agreement and obligation.  *Feyz v. Mercy Memorial Hospital*, 2010 WL 23692 (Mich. App.), *app. denied*, 488 Mich. 852 (2010) ("*Feyz III*") (citing *Thomas v. Leja*, 187 Mich.App. 418, 422, 468 N.W.2d 58 (1991)).

hospital administrator's letter informing her that she had been granted privileges subject to the Bylaws, as set forth above, there is nothing in the Bylaws indicating any agreement on the part of SMMH to be contractually bound thereby.

No case in Michigan has held that the grant of hospital "privileges" creates a contractual relationship between a hospital and a physician.  Moreover, Michigan statutes governing hospitals and other health care facilities use the disjunctive in statutes concerning physicians, separately identifying physicians who have a "contract" with a hospital and those who merely are granted "clinical privileges."  *See e.g.,* M.C.L. § 333.20173a ("a covered facility shall not *employ, independently contract with, **or** grant clinical privileges*  to an individual who ...provides direct services to patients or residents in the covered facility***if the individual...has been convicted of [certain crimes]." If having clinical privileges were to mean the same thing as having a contract with the hospital, such disjunctive treatment in the statutes of "employ," "contract" and "grant clinical privileges" would be unnecessary.

With respect to Plaintiff's reliance on the Medical Staff Bylaws to demonstrate a contractual relationship, as both parties acknowledge, there is a split of authority among the courts of other states on this question.  *See Janda v. Madera Community Hospital* 16 F. Supp. 2d 1181, 1184-1187 (E.D. Cal. 1998) (discussing cases).  However, as indicated above, Michigan courts and federal courts applying Michigan law have held, albeit in unpublished opinions, that medical staff bylaws do not constitute an enforceable contract.

*See Macomb Hospital Center Medical Staff v. Detroit-Macomb Hospital Corp.*, 1996 WL 33347517 at *1 (Mich. App. 1996); *Grain v. Trinity Health*, 431 Fed. App'x 434, 450 (6th Cir. 2011) (applying Michigan law).  *Cf., Ritten v. Lapeer Regional Medical Center, supra*, 611 F. Supp. 2d at 735 (denying summary judgment on the plaintiff's breach of contract claim where the Chair of the Hospital Board of Trustees testified that the Bylaws are binding on the Board and the medical staff alike.  *Id.* at 735.)[18]

Furthermore, cases holding otherwise, mistakenly conflate **medical staff** *bylaws* with **hospital** *bylaws*.  *See e.g., Lewisburg Comm. Hosp. v. Alfredson*, 805 S.W. 2d 756, 759 (Tenn. 1991); *Anne Arundel General Hosp. v. O'Brien*, 49 Md. App. 362, 432 A.2d 483, *cert. denied*, 291 Md. 772 (1981); *St. John Hosp. Med. Staff v. St. John Regional Med. Center*, 90 S.D. 674, 245 N.W.2d 472 (1976).  These cases all hold that a *hospital*'s corporate bylaws are part of a medical staff member's contract with the hospital, but the court in *Islami v. Covenant Medical Center, Inc.*, 822 F. Supp. 1361 (N.D. Iowa 1992) (cited by and relied upon by the court in *Ritten, supra*), relied  upon these cases for the proposition that *medical staff* bylaws constitute a contract).  As succinctly explained by the court in *Van v. Anderson*, 199 F. Supp. 2d 550 (N.D. Tex. 2002), *aff'd*, 66 Fed.

---

[18]   In *Ritten*, the Court noted the split of authority nationally as to whether medical staff bylaws constitute a contract and decided to follow the then majority line of cases that held such bylaws do create a contract.  *See Ritten*, 611 F. Supp. 2d at 734.  *Ritten*, however, pre-dated both the Michigan Court of Appeals decision in the *Macomb Medical Staff* case and the Sixth Circuit's decision in *Grain*. If the Court were to decide *Ritten* today, if it were not for the additional testimony of the Chair of the Lapeer Hospital Board of Trustees, its decision would have been different.

App'x 524 (5th Cir. 2003):

> [A]n important distinction exists between (a) medical [staff] bylaws, which are created by the medical staff to control the governance of the medical professionals with privileges at the hospital and (b) hospital bylaws, which are a set of bylaws created by the hospital itself and adopted by its governing board.  Under the former, it is generally understood that rights promulgated by *medical staff bylaws* are considered incapable of creating an enforceable contract between the hospital and its physicians.  However, under the latter, procedural rights prescribed under *hospital bylaws* may constitute contractual rights between the physician and the adopting hospital.

*Id.* at 562-63 (discussing Texas law; emphasis in original and internal citations omitted).

Thus, where, as here, the Medical Staff Bylaws merely authorize that the Medical Staff to make **recommendations** to the Board of Trustees on the granting, suspension or revocation of clinical privileges, and the Board of Trustees is under no obligation to accept the Staff recommendations, *see e.g.,* Bylaws, § 4.6.3.7; § 7.1.2., 4, the Medical Staff Bylaws do not constitute a binding contract.  *Van v. Anderson, supra*, 199 F. Supp. 2d at 563-64; *see also Weary v. Baylor Univ. Hosp.*, 360 S.W.2d 895, 897 (Tex. Civ. App. 1962) (concluding that medical staff bylaws did not constitute a binding contract because the bylaws only permitted the staff to recommend and advise on reappointments, and the governing body of the hospital was under no obligation to accept or reject the recommendations of the staff).  For all of these reasons, the Court finds that Plaintiff has failed to state a claim of breach of contract.  Accordingly, the Court will grant Defendants' motion for summary judgment on Count IX of Plaintiff's Complaint.

E.    BECAUSE PLAINTIFF HAS FAILED TO ESTABLISH THAT SHE HAD A

CONTRACT WITH SMMH, SUMMARY JUDGMENT WILL ALSO BE
GRANTED ON  HER SECTION 1981 CLAIM

Count IV of Plaintiff's Complaint contains a second claim under 42 U.S.C. §

1981, to-wit, a claim that Defendants discriminated against her based on her race

(African-American).

42 U.S.C. § 1981 provides:

**(a) Statement of Equal Rights**.  All persons within the jurisdiction of the
United States shall have the same right in every State and Territory to make
and enforce contracts, to sue, be parties, give evidence, and to the full and
equal benefit of all laws and proceedings for the security of persons and
property as is enjoyed by white citizens, and shall be subject to like
punishment, pains, penalties, taxes, licenses, and exactions of every kind,
and to no other.

**(b) "Make and enforce contracts" defined**.  For purposes of this section,
the term "make and enforce contracts" includes the making, performance,
modification, and termination of contracts, and the enjoyment of all
benefits, privileges, terms, and conditions of the contractual relationship.

**(c) Protection against impairment**. The rights protected by this section
are protected against impairment by nongovernmental discrimination and
impairment under color of State law.

42 U.S.C. § 1981.

Plaintiff here presents her claim under § 1981's "right to make and enforce

contract" provision. It is axiomatic that as a threshold matter, to establish a claim of

denial of rights under this provision, the plaintiff must show the existence of a contract

between himself and the defendant.  *Van v. Anderson, supra*, 199 F. Supp. 2d at 562;

*Ennix v. Stanten*, 556 F. Supp. 2d 1073, 1082 (N.D. Cal. 2008).  The Sixth Circuit has

held that state law governs as to whether a contract exists between the parties under

Section 1981. *See Talwar v. Catholic Healthcare Partners*, 258 Fed. App'x. 800, 803

(6th Cir. 2007), *cert. denied*, 555 U.S. 1035 (2008). Inasmuch as the Court has

concluded that the Bylaws fail to establish any cognizable contract between Plaintiff and

SMMH under Michigan law, her § 1981 claim, like her breach of contract claim fails as a

matter of law.[19]

F.    IF PLAINTIFF HAS DEMONSTRATED THAT A CONTRACT EXISTS, HER
      CLAIMS IN THIS ACTION ARE PRECLUDED BY THE WAIVER OF
      CLAIMS PROVISION IN THE BYLAWS

Assuming *arguendo* that the Bylaws constitute a cognizable contract, Plaintiff

fares no better.

Article XV of the Bylaws sets forth a "Waiver of Claims."

Article XV provides:

Each applicant to and member of the Medical Staff and each applicant for
and holder of clinical privileges (included Allied Health Professionals and
House Physicians):

Waives any claim, present or future, against the Hospital, the Medical Staff,
and/or any of their representatives, relative to any good faith act,
communication, or recommendation made or requested, concerning such
practitioner's qualifications and conduct and evaluation thereof. . . .

Bylaws Article XV, § 15.1, Defendants' Ex. 33, p. 63.

In Michigan, "the validity of a release turns on the intent of the parties. A release

---

[19] Even if the Court were persuaded that Plaintiff has demonstrated the existence
of a contract, as discussed in Section G *infra*, she fails to make out any legally cognizable
claim that Defendants took the actions of which she complains based on her race.

must be fairly and knowingly made to be valid.  If the language of a release is clear and

unambiguous, the intent of the parties is ascertained from the plain and ordinary meaning

of the language." *Batshon v. Mar-Que Gen. Contractors, Inc.,* 463 Mich. 646, 650 n.4

(2001).

The language of the release in the Waiver of Claims provision in the Medical Staff

Bylaws is clear and unambiguous.  Numerous courts have found such releases in medical

staff bylaws binding on plaintiffs who, like Plaintiff Brintley, upon applying for clinical

staff privileges, signed an acknowledgment agreeing to be bound by the terms and

provisions of Bylaws.  *See e.g., Deming v. Jackson-Madison County General Hospital*

*District*, 553 F. Supp. 2d 914, 936-38 (W.D. Tenn. 2008) (plaintiff-physician's claims of

civil rights violations pursuant to 42 U.S.C. § 1983, antitrust claims under the Sherman

Act, and state law claims for breach of contract, business disparagement, defamation,

tortious interference with business relationships, intentional infliction of emotional

distress, and violations of state statutes held waived by waiver provision in the medical

staff bylaws); *DeLeon v. Saint Joseph Hospital, Inc.*, 871 F2d 1229, 1234 (4th Cir.), *cert.*

*denied*, 493 U.S. 825 (1989) (affirming district court's determination that plaintiff's

defamation claims were barred by release executed by him at the time of his application

for admitting privileges); *Sibley v. Lutheran Hospital of Maryland, Inc.,* 871 F.2d 479,

486 (4th Cir. 1989) (claims of negligent and intentional withholding and termination of

hospital privileges held barred by waiver provision in bylaws); *Bhan v. Battle Creek*

*Health System*, 2012 WL 489161 (W.D. Mich., Feb. 14, 2012) (granting defendants'

motion to dismiss the plaintiff-physician's breach of contract claim based on the release

contained in the medical staff bylaws, explaining; "If Bhan states a valid breach of

contract claim, then Counts 11, 12, 13 and quite likely others, are precluded by the

release of liability.  If the bylaws do not create a contract, then these counts would be

dismissed [pursuant to *Grain* and *Macomb Hospital*].  Thus, assuming, without deciding,

that the medical staff bylaws constituted an enforceable contract, Bhan's breach of

contract claims will be dismissed as falling under the release from liability that Bhan

entered into by applying for medical staff privileges." *Id*. at ** 5-6).

As noted by the Court in *Bhan*, and as determined by the courts in *Deming*,

*DeLeon* and *Sibley*, the Waiver of Claims provision in the SMMH Medical Staff Bylaws

precludes all of the claims Plaintiff asserts in this action.  As the court in *Deming* found

with respect to the plaintiff's claims in that case -- including his Section 1983

constitutional claims -- the waiver provision clearly applies to any and all claims.

"[T]here is no broader classification than the word 'all.' In its ordinary and natural

meaning, the word 'all' leaves no room for exceptions." *Skotak v. Vic Tanny Int'l*, 203

Mich. App. 616, 619, 513 N.W.2d 428, *app. denied*, 447 Mich. 970 (1994). Such a

waiver is valid if the surrounding facts and circumstances make it clear that it was done

voluntarily, knowingly, and intelligently. *Deming*, 533 F. Supp. at 938 (citations

omitted). *See also Skotak v. Vic Tanny Int'l*, *supra*, 203 Mich. App. at 618 (contractual

waivers of claims will be enforced where the waiver is fairly and knowingly made.)

The Sixth Circuit set forth the framework for assessing the voluntariness of releases of claims in *Adams v. Philip Morris*, 67 F.3d 580 (6th Cir.1995). Under that standard,

> In evaluating whether a release has been knowingly and voluntarily executed, we look to (1) plaintiff's experience, background, and education; (2) the amount of time the plaintiff had to consider whether to sign the waiver, including whether the employee had an opportunity to consult with a lawyer; (3) the clarity of the waiver; (4) consideration for the waiver; as well as (5) the totality of the circumstances.

*Id*. at 583 (citations omitted).

Here, there is a clear, unambiguous waiver of "any claim, present  or future". Plaintiff Brintley is an educated woman and an experienced healthcare professional.  She acknowledged receipt of a copy of the Bylaws and admitted in writing when she applied for clinical privileges at SMMH that she "studied the contents carefully and agree[d] to be bound by them" upon becoming a member of the medical staff. *See* Defendants' Ex. 33, pp. 2, 9.  She has offered no evidence that she did not understand the consequences of the waiver.  Indeed, she signed a similar Release when she left her prior position at Foote Hospital, releasing  "any and all claims (including any and all pending claims), demands, actions, causes of action and rights which she may have or conceive herself to have" against Foote Hospital, its medical staff, and their agents and employees. *See* Defendants' Ex. 11.  Further, Plaintiff had an opportunity to consult with a lawyer before signing the acknowledgment and agreement to be bound inasmuch as she testified at the Peer Review

40

Hearing that she was represented by counsel throughout the proceedings surrounding her resignation from Foote Hospital which immediately preceded her application for privileges at SMMH, and further testified that her attorney was involved in her decision to apply at SMMH. *See* Peer Review Tr. Vol. III, p. 798. There is simply no evidence from which it might be inferred that Plaintiff did not understand the consequences of the waiver.

For all of these reasons, if the Bylaws are deemed to constitute a contract, then Plaintiff's breach of contract claim and all of the other claims in this action are barred. The Court, nonetheless, will proceed for present purposes as if no contract was created by the Bylaws and, for completeness, will evaluate the merits of the remaining claims in Plaintiff's Complaint.

G.     PLAINTIFF HAS FAILED TO MAKE OUT A CLAIM OF RACE OR <u>GENDER DISCRIMINATION UNDER THE ELLIOTT-LARSEN ACT</u>

In Counts VI and VII of her Complaint, Plaintiff alleges claims of race and gender discrimination in violation of the public accommodations provision of the Elliott-Larsen Civil Rights Act, M.C.L. § 37.2302(a), which provides:

Except where permitted by law, a person shall not:

(a) Deny an individual the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of a place of public accommodation or public service because of religion, race, color, national origin, age, sex, or marital status.

M.C.L. § 37.2302(a).[20]

In *Haynes v. Neshewat*, 477 Mich. 29, 729 N.W.2d 488 (2007), the Michigan Supreme Court held that an African-American physician with staff privileges at a hospital could make out a claim of race discrimination under § 37.2302(a) against the hospital and the hospital's chief of staff based on restrictions placed on his hospital privileges.[21]

---

[20]  Under the Elliott-Larsen Act, a "place of public accommodation" is any "business, or an educational, refreshment, entertainment, recreation, health, or transportation facility, or institution of any kind, whether licensed or not, whose goods, services, facilities, privileges, advantages, or accommodations are extended, offered, sold, or otherwise made available to the public."  M.C.L. § 37.2301(a).

[21]  The plaintiff in *Haynes v. Neshewat*, was physician with clinical privileges at Oakwood Hospital in Dearborn, Michigan and Oakwood Hospital-Seaway Center.  In November 2000, Seaway's Medical Executive Committee investigated allegations of unprofessional behavior regarding Dr. Haynes. The MEC found that the charges were substantiated and recommended that Haynes take various corrective actions requiring him to (1) take fifteen Continuing Medical Education ("CME") credits in critical care

medicine, (2) complete the Internal Medicine Board Review Course, (3) consult with an intensivist for each admission to the intensive care unit, and (4) undergo an evaluation for anger management. *See Haynes v. Neshewat*, 2005 WL 1489599 at *1 (Mich. App. 2005).

Haynes' subsequent internal peer review was unsuccessful and the MEC's recommendation was affirmed. *Id.* Thereafter, he filed suit in circuit court alleging tortious interference with business relationships and expectancies, negligence, discrimination under the public accommodations provision of the Elliott-Larsen Act, and civil conspiracy. *Id.*

The defendants subsequently moved for summary disposition arguing, among other things, that a hospital is not a place of public accommodation with regard to its decisions concerning the grant of medical staff privileges. *Id.* After hearing arguments, the trial court issued an order denying in part and granting in part defendants' motion: the trial court dismissed plaintiff's various common law tort claims, but denied summary disposition with respect to his public accommodation and conspiracy claims under the ELCRA on the basis that the defendant institutions were places of public accommodation under the ELCRA's broad statutory language, and that plaintiff had sufficiently pleaded claims of discriminatory treatment. *Id.*

The Michigan Court of Appeals reversed, finding that health facilities such as the defendant hospitals constitute a place of public accommodation only when their goods, services, facilities, privileges, advantages, or accommodations are extended, offered, sold, or otherwise *made available to the public*. *Id.* at *3. Because medical staff privileges are not made available to the public, the Court of Appeals held the offering of such privileges was "insufficient to render the facility a place of public accommodation" for purposes of the ELCRA.

The Supreme Court granted leave to appeal and reversed the Court of Appeals ruling:

> The public accommodations provision of the CRA, MCL 37.2302, does not limit its prohibition against discrimination to members of the public. Rather, § 302(a) prohibits unlawful discrimination against any individual's full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of a place of public accommodation.

> Plaintiff is a physician with staff and clinical privileges at Oakwood.

43

In order to state a claim under M.C.L. § 37.2302(a), a plaintiff must establish four elements:  (1) discrimination based on a protected characteristic (2) by a person, (3) resulting in the denial of the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations (4) of a place of public accommodation. *Haynes v. Neshewat*, 477 Mich. at 35, 729 N.W.2d at 492.  Only the first element is at issue in this case.

Plaintiff here is alleging discrimination based on race and sex.  The same requirements for establishing a claim of discrimination under other sections of the ELCRA apply in cases brought under § 37.2302.  *Clarke v. K-Mart Corp.*, 197 Mich. App. 541, 545, 495 N.W.2d 820, 822 (1992), *app. denied*, 443 Mich. 862 (1993); *Schellenberg v. Rochester Michigan Lodge No. 2225 of the Benev. and Prot. Order of Elks*, 228 Mich. App. 20, 32, 577 N.W.2d 163, 169 (1998).

A plaintiff can establish a claim of unlawful discrimination under the Elliott-Larsen Act either (1) by producing direct evidence of discrimination or (2) by presenting a *prima facie* case of discrimination in accordance with the *McDonnell Douglas/Burdine* framework established by the United States Supreme Court for use in Title VII cases.  *Hazle v. Ford Motor Co.*, 464 Mich. 456, 462-62, 628 N.W.2d 515,

---

By alleging that defendants' discriminatory behavior deprived him of the opportunity to fully utilize the Oakwood medical facilities, plaintiff stated a cause of action under the CRA.

477 Mich. at 40, 729 N.W.2d at 495.

44

520-21 (2001); *Schellenberg v. Rochester Elks, supra*.[22]

Plaintiff here has presented her discrimination claims as "disparate treatment" claims using the *McDonnell Douglas/Burdine* framework.

Under the *McDonnell Douglas/Burdine* paradigm, Plaintiff can establish a *prima facie* case of discrimination under the ELCRA's public accommodations provision by showing that: (1) she is a member of a class deserving of protection under the statute, and that for the same or similar conduct, she was treated differently than similarly-situated persons outside the protected class.[23] *Schellenberg, supra; Sanders v. Southwest Airlines*

---

[22] Section 1981claims are subject to the same requirements as Title VII and Elliott-Larsen claims. *Keck v.Graham Hotel Systems, Inc.*, 566 F.3d 634, 639 (6th Cir. 2009) (§ 1981).

[23] In the public accommodations context, Michigan courts do not require that the plaintiff show she was "qualified" for the position. Defendants nonetheless devote three pages of their brief to arguing that Plaintiff Brintley was not qualified for her position as a general surgeon at the time her privileges were suspended. *See* Defendants' Brief, pp. 26-28. However, even if the "qualified" prong of the *McDonnell Douglas* framework used in employment discrimination cases were part of the *prima facie* denial of public accommodations case, in *Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 665 (6th Cir. 2000), the Sixth Circuit cautioned that the courts must not use the "qualified" element of the *prima facie* case to heighten the plaintiff's initial burden. In an effort to ensure that the first two stages of the *McDonnell Douglas* inquiry remain analytically distinct, and that a plaintiff's initial burden not be too onerous, the legitimate non-discriminatory reason offered by the employer at the second stage of the *McDonnell Douglas* inquiry may not be considered in determining whether the employee has produced sufficient evidence to establish a *prima facie* case. *Id*. at 660-1. *See also Macy v. Hopkins County School Bd. of Educ*., 484 F.3d 357, 366 (6th Cir.), *cert. denied*, 552 U.S. 826 (2007) ("[W]hen assessing whether a plaintiff has met [her] employer's legitimate expectations at the *prima facie* stage of a termination case, a court must examine plaintiff's evidence independent of the nondiscriminatory reason produced by the defense as its reason for terminating plaintiff.")

*Co.*, 86  F. Supp. 2d 739, 744 (E.D. Mich. 2000); *see also Neck v. Graham Hotel Systems, Inc.*, 566 F.3d at 639 (applying the modified *McDonnell Douglas* analysis established for commercial establishment claims in *Christian v. Wal-Mart Stores, Inc.*, 252 F.3d 862, 872 (6th Cir. 2001)).[24]

---

[24] Under the "commercial establishment claim" modification established in *Christian v. Wal-Mart*, to state a *prima facie* claim, plaintiffs must show that (1) they belong to a protected class; (2) they sought to make a contract for services ordinarily provided by the defendant; and (3) they were either (a) denied the right to enter into a contract for such services while similarly-situated persons outside the class were not, *or* (b) were treated in such a hostile manner that a reasonable person would find it objectively discriminatory.  252 F.3d at 872.

Plaintiff vigorously argues in her Response Brief in this case for application of the "hostile treatment" modification utilized in commercial establishment claims, citing as authority *Jeung v. McKrow*, 264 F. Supp. 2d 557, 567-68 (E.D. Mich. 2003), a case brought pursuant to 42 U.S.C. § 1981.  *Jeung*, however, was not purely a revocation of privileges case; rather it had the added feature of the hospital's failure to honor its agreement to purchase the plaintiff-physician's medical practice.  Such a refusal to purchase on the basis of race may properly call for application of the commercial modification of the *McDonnell Douglas* framework. However, the court there did not decide the privileges and commercial contract aspects of the *Jeung* case separately; rather, it appears that he decided both claims using the modified *McDonnell Douglas* paradigm.

As a decision of another district court, *Jeung* is not binding on this Court.  To the extent the court in *Jeung* may have decided the revocation of privileges issue by applying the commercial establishment modification of the *McDonnell Douglas* test, this Court would disagree with the determination that the modification should be used in this context.

The features of commercial, retail dealings which led the Sixth Circuit to formulate the modification in *Christian* and re-affirm it in *Keck*, are absent in limitation/revocation of medical privileges cases.  Unlike retail sale cases, revocation of privileges cases are more akin to termination of employment cases.  Furthermore, the Michigan courts have continued to apply the *un*modified *McDonnell Douglas* framework in public accommodations cases arising under the ELCRA, even in the commercial

Once a plaintiff establishes a *prima facie* case of discrimination, the burden of production then shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the defendant's action. *DiCarlo v. Potter*, 358 F.3d 408, 414 (6th Cir.2004); *Clarke v. K-Mart,* 197 Mich. App. at 545, 495 N.W.2d at 822. If the defendant carries this burden, the plaintiff must prove that the legitimate reasons offered by the defendant were in fact a pretext for discrimination. *DiCarlo* at 414-15; *Clarke*, 197 Mich. App. at 545, 495 N.W.2d at 822. Throughout this shifting burdens framework applicable when circumstantial evidence is involved, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *DiCarlo, supra*; *see also, Talley v. Bravo Pitino Rest., Ltd*., 61 F.3d 1241, 1246 (6th Cir.1995).

There is no dispute in this case that Plaintiff Brintley satisfies the first element of a *prima facie* case of discrimination under the ELCRA -- she is an African-American woman and, thus, is a member of a class deserving of protection under the statute. However, Plaintiff has not shown that for the same or similar conduct she was treated differently than non-protected class persons. Dr. Brintley has identified two physicians -- Dr. Leila Hajar, a white female and Dr. Robert Salamon, a white male -- with whom she

---

establishment context. *See e.g., Schellenberg v. Elks*, 577 N.W.2d at 169; *Clarke v. K-Mart*, 495 N.W.2d at 822; *see also Sanders v. Southwest Airlines*, 86 F. Supp.2d at 744 (applying Michigan law). Therefore, this Court concludes that the conventional *McDonnell Douglas* framework -- not the commercial establishment modification of the framework -- should be used in this case.

47

compares her treatment.  Although both Dr. Hajar and Dr. Salamon were required to undergo proctorships like Plaintiff, Plaintiff claims they were treated more favorably than she was with respect to their proctorships.

It is fundamental that to make a comparison of a discrimination plaintiff's treatment to that of non-protected class individuals, the plaintiff must show that the "comparables" are similarly-situated in all relevant respects. *Mitchell v. Toledo Hospital*, 964 F.2d 577, 583 (6th Cir. 1992); *Ercegovich v. Goodyear Tire & Rubber Co*., 154 F.3d 344, 353 (6th Cir.1998); *Bobo v. United Parcel Service, Inc.,* 665 F.3d 741, 751 (6th Cir. 2012). Thus, to be deemed "similarly-situated", the individuals with whom the plaintiff seeks to compare his/her treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.  *Mitchell, supra* (citations omitted).  *See also Wright v. Murray Guard, Inc*., 455 F.3d 702, 710 (6th Cir.2006) (citing *Clayton v. Meijer, Inc.*, 281 F.3d 605, 611 (6th Cir.2002)) (conduct of the plaintiff's comparators must be similar in kind and severity).

Plaintiff cannot make the required showing with respect to the doctors she identifies as her comparables.

First, with respect to Dr. Hajar, the white female doctor with whom Plaintiff attempts to compare herself, Dr. Hajar was not a general surgeon under the auspices of

48

the Surgical Performance Improvement Committee.  Dr. Hajar was an Ob-Gyn.

Obstetrics and Gynecology is not part of the General Surgery Department; it is a separate

department with its own performance improvement committee.  *See* Deposition of Dr.

Hallal, Plaintiff's Ex. 47, pp. 17, 66.  Dr. Michael Gatt was the Chair of the Division of

Obstetrics and Gynecology, not Dr. Roc.  *See* Hajar Dep. Vol. II, Plaintiff's Ex. 53, p. 57.

Therefore, recommendations and decisions regarding concerns about Dr. Hajar's

technical deficiencies were made by a different group of decisionmakers.

Further, to the extent that Plaintiff complains that when Dr. Hajar was required to

undergo a proctorship, she was allowed to choose whomever she wanted to serve as her

proctor, the evidence of record shows that Hajar never underwent any corrective

"proctoring."  Rather, she voluntarily agreed, as part of an ongoing peer/professional

review process, for a period of 90 days, to seek input and consult with a Henry Ford

Medical Group obstetrician whenever she was to perform labor and delivery care.  *See*

Hajar Dep., ex. 4,   Defendants' Reply Brief Ex. 4.  Therefore, she cannot compare the

requirement that she have one of three specified general surgeons proctor her procedures

to the treatment of Dr. Hajar.

As for Plaintiff's claim that her proctorship requirements should be compared to

the proctorship of Dr. Salamon -- which also focus on Dr. Salamon's alleged ability to

choose whom he wanted as a proctor -- Dr. Salamon is an orthopedic surgeon.  As Dr.

Gokli testified, the decision of the MEC with regard to both Dr. Brintley and Dr.

49

Salamon was that there should be no more than three different persons proctoring their surgeries; if there were more than three physicians proctoring them, there would not be a significant enough number of cases proctored by one person to get a valid evaluation of the proctored doctor's performance. *See* Gokli Dep., p. 77. Because the orthopedic section was smaller than general surgery, and the section was structured much differently than general surgery,[25] and because Dr. Salamon worked very slowly and had to have 30 cases proctored (i.e., ten more than Dr. Brintley), there were only, at most, two or three orthopedic surgeons available to proctor Dr. Salamon's cases. *Id.*, pp. 80-96. The MEC was aware that this would be the case when it imposed the proctorship requirements on Dr. Salamon. *Id.*, at p. 84. Therefore, Dr. Salamon, like Dr. Brintley, was able to choose from only three possible proctors for his surgeries. *See id.*, p. 90; *see also* Salamon Dep., p. 26, 56 (testifying that only Dr. Elie Khoury, Dr. Michael Brager, and Dr. Robert Travis proctored him). Furthermore, Plaintiff cannot show that Dr. Salamon's medical errors were as serious as hers. Unlike Dr. Brintley, none of Dr. Salamon's patients' lives were ever in danger and never came close to being in danger due to hemorrhaging caused

---

[25] Dr. Gokli testified that the orthopedic section was comprised of two "groups" of physicians -- the five Mendelsohn-family doctors made up one group, while Dr. Salamon, his two partners made up the other. (There was, in addition, one "independent" orthopedic surgeon.) *See* Gokli Dep., pp. 81-82. Doctors from the two different groups were at the time embroiled in bitter litigation such that "Dr. Salamon would not enter a room where Dr[s]. Mendelsohn[] would be present. He would not go to meetings where they would be present. Dr. Mendelsohn[] had issues with these guys. So they cold [sic; could] not even look at each other or be in a room together." *Id.* Meanwhile, the independent doctor, Dr. Travis, worked "mostly at Annapolis Hospital." *Id.* at p. 82.

by his error.  *See* Salamon Dep., Plaintiff's Ex. 47, pp. 50-56 (discussing review conducted for SMMH of Dr. Salamon's cases).  In sum, Plaintiff has failed to show that she was treated differently in any material fashion from similarly-situated non-protected physicians.  Plaintiff, therefore, has failed to establish a *prima facie* case of race or sex discrimination.

However, assuming *arguendo* Plaintiff has raised a genuine issue of material fact with regard to her *prima facie* case, the Court will examine the question of whether Defendants have articulated a legitimate non-discriminatory reason for their actions. Here, the evidence of record shows that the recommendation for proctorship and subsequent suspension of Plaintiff's privileges were based on serious quality of medical care concerns and Plaintiff's inability and unwillingness to adhere to the terms of the proctorship.

The burden of production, therefore, shifts back to Plaintiff to demonstrate by a preponderance of the evidence that the legitimate reasons offered by Defendants were in fact a pretext for discrimination.  *DiCarlo v. Potter*, 358 F.3d at 415; *Clarke v. K-Mart*, 197 Mich. App. at 545, 495 N.W.2d at 822. Plaintiff can establish pretext by demonstrating that the reasons offered by the defendant: (1) has no basis in fact; (2) did not actually motivate the adverse employment decision in question, or (3) was insufficient to warrant the decision. *Zambetti*, 314 F.3d at 258 (citing *Manzer v. Diamond Shamrock Chem. Co.*, 29 F.3d 1078, 1084 (6th Cir.1994)).

51

Under federal law, a showing that a proffered reason had "no basis in fact" consists of evidence establishing that the proffered reasons for the defendant's actions never happened, or are factually false. *Manzer*, 29 F.3d at 1084. To make a showing that the proffered reasons "did not actually motivate the employer's conduct," the plaintiff must present evidence "which tend[s] to prove that an illegal motivation was *more* likely than that offered by the defendant." *Id.* Finally, a showing that the proffered reasons were "insufficient to motivate the employer" consists of evidence that other individuals, particularly individuals not in the protected class, were not treated the same way, even though they engaged in substantially identical conduct. *Manzer,* 29 F.3d at 1084.

According to the *Manzer* court, the first and third types of rebuttals  -- that the reason offered by the defendant has no basis in fact or was insufficient to warrant the defendant's decision -- "are direct attacks on the credibility of the [defendant's] proffered motivation for [its actions], and if shown, provide an evidentiary basis for what the Supreme Court has termed a 'suspicion of mendacity,'" sufficient to withstand summary judgment. *Id*.

Michigan's law regarding pretext law differs from federal law in this regard in that it requires "pretext plus." Under Michigan law,

> [D]isproof of [a defendant's] articulated reason for an adverse employment decision defeats summary disposition only if such disproof also raises a triable issue that discriminatory animus was a motivating factor underlying the [defendant's] adverse action. In other words, plaintiff must not merely raise a triable issue that the [defendant's] proffered reason was pretextual, but that it was a pretext for . . . discrimination. Therefore, . . . in the context of summary disposition, a plaintiff must prove discrimination with

52

admissible evidence, either direct or circumstantial, sufficient to permit a
reasonable trier of fact to conclude that discrimination was a motivating
factor for the adverse action taken by the [defendant] toward the plaintiff.

*Malady v. Lytle*, 458 Mich. 153, 579 N.W.2d 906, 916 (1998) (footnotes omitted);  *see
also Town v. Michigan Bell Telephone Co.*, 455 Mich. 688, 568 N.W.2d 65, 68-69
(1997).

Plaintiff here cannot meet this burden.  Plaintiff's only evidence of pretext is the
deposition testimony of Dr. Salamon, who testified in his deposition, "[M]y partner is
very close with Dr. Dirani, who's also on the medical executive committee, and he was
told and I was told by Dr. Dirani [26] that this was going to be done to me so that they
won't look bad because of what they're doing to Dr. Brintley." Salamon Dep., p. 34.[27]

Salamon's deposition testimony about what Dr. Dirani allegedly told him and his
partner is hearsay buried under multiple other layers of hearsay.

---

[26]  Dr. Salamon testified that Dr. Dirani is a friend of his.  *Id*., at p. 48.

[27]  To the extent that Plaintiff contends that Dr. Dirani's statement constitutes
"direct evidence" of discrimination, she is mistaken.  "Direct evidence" of discrimination
is "evidence which, if believed, *requires* the conclusion that unlawful discrimination was
at least a motivating factor in the employer's actions."  *See Talley,* 61 F.3d at 1268;
*Hazle v. Ford Motor Co.,* 464 Mich. at 462, 638 N.W.2d at 520 (quoting *Jacklyn v.
Schering-Plough Healthcare Products Sales Corp.*, 176 F.3d 921, 926 (6th Cir. 1999)).
Put another way, "direct evidence of discrimination does not require a factfinder to draw
any inferences in order to conclude that the challenged employment action was motivated
at least in part by prejudice." *Schweitzer v. Teamster Local 100*, 413 F.3d 533, 537 (6th
Cir. 2005) (citation omitted).  Here, to find that Defendants' actions against Dr. Brintley
were motivated by racial or gender animus, the factfinder would have to infer from Dr.
Dirani's statement that the corrective action measures imposed upon Dr. Salamon were
merely a cover-up for the hospital's alleged discriminatory treatment of Dr. Brintley.

Hearsay is defined as "a statement that (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement." Fed. R. Evid. 801(c). Generally, hearsay is not admissible. *See* Fed. R. Evid. 802. It is well-settled that inadmissible hearsay cannot be used to oppose summary judgment. *Hartsel v. Keys*, 87 F.3d 795, 803 (6th Cir. 1996), *cert. denied*, 519 U.S. 1055 (1997); *Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 927 (6th Cir.1999); *Alpert v. United States*, 481 F.3d 404, 409 (6th Cir.2007); *see also* Fed. R. Civ. P. 56(c)(2), (4). As such, "hearsay evidence" used to counter a motion for summary judgment "must be disregarded." *Alexander v. Caresource*, 576 F.3d 551, 558 (6th Cir. 2009). Further, evidence containing multiple levels of hearsay is inadmissible for its truth unless each layer, analyzed independently, falls within an established hearsay exception or is treated as nonhearsay. Fed. R. Evid. 805; *Moore v. KUKA Welding Sys. & Robot Corp.*, 171 F.3d 1073, 1081 (6th Cir. 1999).

In this case, Plaintiff's pretext evidence is Dr. Salamon's out-of-court deposition statement about (1) what Dr. Dirani had told him and (2) what Dr. Salamon's partner told Dr. Salamon about what Dr. Dirani had said. This statement is being offered to prove the truth of the matter asserted, i.e., the relationship between Dr. Salamon's treatment and the treatment of Plaintiff. The "form" of Dr. Salamon's statement -- i.e., a statement made in an out-of-court deposition -- is not the issue. *See Celotex v. Catrett*, *supra*, 477 U.S. at 324, 105 S.Ct. at 2553 (explaining that in requiring the nonmoving party to produce

54

evidence to withstand a motion for summary judgment, "[w]e do not mean that the

nonmoving party must produce evidence in a form that would be admissible at trial"); *see*

*also Fraser v. Goodale* 342 F.3d 1032, 1036 (9th Cir. 2003), *cert. denied*, 541 U.S. 937

("At the summary judgment stage we do not focus on the admissibility of the evidence's

form.").  As explained in *Bailey v. Floyd County Board of Education*, 106 F.3d 135 (6th

Cir.1997):

> Rule 56 requires the plaintiff to present evidence of evidentiary quality that
> demonstrates the existence of a genuine issue of material fact.  Examples of such
> evidence include admissible documents or attested testimony, such as that found
> in affidavits or depositions.  The proffered evidence need not be in admissible
> form, but its content must be admissible.  For instance, deposition testimony will
> assist a plaintiff in surviving a motion for summary judgment, even if the
> deposition itself is not admissible at trial, provided substituted oral testimony
> would be admissible and create a genuine issue of material fact.

*Id.* at 145 (citations omitted).

 Here, however, the content -- i.e., Dr. Salamon's statement about what Dr. Dirani

said -- is hearsay.  And, what Dr. Salamon's partner said Dr. Dirani told him [the partner]

-- is classic hearsay-within-hearsay.  Dr. Salamon's "live" testimony at trial would not

change cure the hearsay nature of any of this evidence.

Conspicuously absent from the voluminous amount of evidence supplied by

Plaintiff in support of her opposition to the motion for summary judgment is any

deposition, affidavit or declaration from Dr. Dirani.[28]  Furthermore, there is nothing in the

---

[28]  Plaintiff did not make any request pursuant to Fed. R. Civ. P. 56(d) for
additional time to obtain Dr. Dirani's affidavit or to take his deposition. ("If a nonmovant

record of this matter indicating that Dr. Dirani will testify at trial to what Dr. Salamon said Dirani told him and his partner. *See McMillan v Johnson*, 88 F.3d 1573, 1584 (11th Cir. 1996) (refusing to consider hearsay evidence offered in opposition to a motion for summary judgment where there was nothing in the record suggesting that there were any witnesses who would be able to testify at trial from their personal knowledge of the matters recounted by the hearsay declarant), *aff'd sub nom McMillan v. Monroe County,* 520 U.S. 781 (1997). The mere possibility that Plaintiff might be able to call Dr. Dirani to provide direct testimony on this matter is insufficient to establish that the hearsay statement could be reduced to admissible evidence at trial. *See Jones v. UPS Ground Freight*, 683 F.3d 1283, 1294 (11th Cir. 2012) (citing *McMillan v. Johnson*, *supra* ("[A] suggestion that admissible evidence might be found in the future is not enough to defeat a motion for summary judgment.")).

Even if the Court could consider Dr. Dirani's alleged statement to Dr. Salamon under some hearsay exception theory,[29] this evidence is too ambiguous to create an

_____

shows by affidavit or declaration, that, for specified reasons, [she] cannot present facts essential to justify [her] opposition, the court may: (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order." Fed. R. Civ. P. 56(d). Where no affidavits are taken from the hearsay declarants and no effort made to depose them or to obtain a delay in the court's consideration of the motion until such depositions can be taken, the district court does not err in disregarding the hearsay evidence and may properly decide a summary judgment motion based on the admissible evidence before it. *See State Mut. Life Assur. Co. v. Deer Creek Park*, 612 F.2d 259, 268 (6th Cir. 1979).

[29] As Dr. Dirani is not a party to this litigation, *see* Fed. R. Evid. 801(d)(2)(A), and there is no evidence that he was authorized to speak for any party on this subject,

inference that discrimination on the basis of race or sex was a motivating factor in

Defendants' decision. *See Phelps v. Yale Sec., Inc.*, 986 F.2d 1020, 1025 (6th Cir.), *cert.*

*denied*, 510 U.S. 861, 114 (1993) (isolated and ambiguous comments are insufficient to

support a finding of discrimination). Although Plaintiff argues that discriminatory intent

can be inferred from Dr. Dirani's statement because she is an African-American female

and Dr. Dirani is a white male, Dirani's statement is equally open to an interpretation that

does not implicate race. *See Tyler v. Runyon*, 70 F.3d 458, 467 (7th Cir. 1995)

(Plaintiff's testimony that postmaster allegedly remarked that "if I [plaintiff] thought he

would give me window training, I must be crazy" made after plaintiff had been advised

several times that he would not be provided instruction until a need for more window

clerks arose, and his name came up on the seniority eligibility list, found to be

"ambiguous, at best" and insufficient proof of pretext in a disability discrimination case,

because "crazy" could easily have referred to Tyler's chances of getting immediate

window training, which were nil, because of his lack of seniority. *Id.*); *see also Cleary v.*

*Nationwide Mut. Ins. Co.,* 9 Fed. App'x 1, 9 (4th Cir. 2001) supervisor's statement "I

know you probably think that I've been a real bitch to you and very mean to you, but I've

---

Fed. R. Evid. 801(d)(2)(C), the only conceivable exception would be as a vicarious
admission by an employee or agent about a matter within the scope of the agency or
employment during the tenure of the declarant as employee or agent. Fed. R. Evid.
801(d)(2)(D). The availability of this exception here is dubious. The party arguing for
admission bears the burden of establishing the proper foundation for the admissibility of
the statement. *Mitroff v. Xomox Corp.*, 797 F.2d 271, 275 (6th Cir.1986). Plaintiff has
not done so in this case, and there is no direct or circumstantial evidence of record to
establish that the alleged statement meets the Rule 801(d)(2)(D) criteria.

received a lot of pressure from Nationwide," which the plaintiff interpreted to mean that Nationwide pressured Betts to mistreat him, found too ambiguous a statement upon which to find pretext for discrimination because it could have many other meanings); *Tardanico v. Aetna Life & Cas. Co*., 41 Mass. App. Ct. 443, 671 N.E.2d 510, *review denied*, 423 Mass. 1114, 674 N.E.2d 246 (1996) (decisionmaker's comments that plaintiff "had been around for a long time," and that his work equipment might have been "getting too heavy" for him were found to be too ambiguous to create an inference of discrimination because they were open to an interpretation that did not implicate age.)

Having failed to demonstrate that a discriminatory reason motivated Defendants' actions, Defendants' are entitled to entry of summary judgment on Plaintiff's ELCRA claims in Counts VI and VII of her Complaint.[30]

## H.   PLAINTIFF'S CIVIL CONSPIRACY CLAIM IN COUNT V WILL BE DISMISSED

In Count V of her Complaint, Plaintiff alleges that SMMH and the individual Defendants conspired and acted in concert to discriminate against her on the basis of her race and/or gender.  [*See* Complaint, ¶ 68].  However, under Michigan law, it is axiomatic that a civil conspiracy claim "is not cognizable without a cognizable underlying tort." *Battah v. ResMAE Mortg. Corp*., 746 F. Supp. 2d 869, 875 (E.D. Mich

---

[30]   The Court's determination on Plaintiff's ELCRA discrimination claims is also applicable to her Title VII and Section 1981 claims.  Therefore, if those claims were not subject to dismissal on the other grounds, for the reasons set forth in this Section, they, too, would fail on the merits.

2010) (citing *Admiral Ins. Co. v. Columbia Cas. Ins. Co*., 194 Mich. App. 300, 486 N.W.2d 351, 358–59 (1992)). Where a plaintiff has failed to establish the underlying tort, his civil conspiracy claim also fails. *Nehls v. Hillsdale Coll*., 65 Fed. App'x. 984, 992 (6th Cir.2003).

The same is true under federal law.  "Because the substantive allegations that form the basis of [plaintiff's] conspiracy claims were properly dismissed, [his] conspiracy counts also fail." *Beztak Land Co. v. City of Detroit*, 298 F.3d 559, 569 (6th Cir.2002) (citing *Glassner v. R.J. Reynolds Tobacco Co*., 223 F.3d 343, 354 (6th Cir.2000)) (affirming dismissal of plaintiff's claim of conspiracy under 42 U.S.C. § 1985).  *See also, Smith v. Chattanooga–Hamilton Cnty. Hosp. Auth.*, 829 F.2d 1126, 1987 WL 44448 at *3 (6th Cir.1987) (where the plaintiff's underlying claim of discrimination failed for lack of proof, her § 1985 conspiracy claim also must fail).

As set forth above, Plaintiff has failed to make out a legally cognizable claim of discrimination under state or federal law.  Therefore, her conspiracy claim also fails as a matter of law.

I.      DEFENDANTS ARE ENTITLED TO IMMUNITY FROM LIABILITY ON
        PLAINTIFF'S REMAINING STATE LAW CLAIMS

The remaining claims in Plaintiff's Complaint are state common law claims for

"tortious interference with business expectancies/relationships," "violation of public

policy," and "breach/violation of duty of care."  Defendants maintain that they are

immune from liability for these claims as well as for Plaintiff's claim for breach of

contract in Count VIII (discussed in Section D, above) by virtue of the immunity

conferred under the federal Health Care Quality Improvement Act ("the HCQIA"), 42

U.S.C. § 11101(a)(1) and the Michigan peer review statute, M.C.L. § 331.531(3).

The HCQIA provides immunity from money damages for those engaged in a

professional review action that satisfies specified standards.  The Michigan peer review

statute similarly affords participants in the peer review process qualified immunity from

civil and criminal liability for their peer review activities, unless the participants act with

malice.

"The HCQIA was passed in 1986 to provide for effective peer review and

interstate monitoring of incompetent physicians, and to grant qualified immunity from

damages for those who participate in peer review activities." *Meyers v. Columbia/HCA

Healthcare Corp.*, 341 F.3d 461, 467 (6th Cir.2003) (quoting *Austin v. McNamara*, 979

F.2d 728, 733 (9th Cir.1992)); 42 U.S.C. § 11101. Under the HCQIA, if a "professional

review action" satisfies reasonableness requirements, then the professional review body

that took the action, the members of and staff to this body, and "any person who

60

participates with or assists the body with respect to the action" are "not be liable in

damages under any law of the United States or of any State . . . with respect to the

action." 42 U. S .C. § 11111(a)(1).[31]

The HCQIA defines "professional review action" as:

an action or recommendation of a professional review body which is taken
or made in the conduct of professional review activity, which is based on
the competence or professional conduct of an individual physician (which
conduct affects or could affect adversely the health or welfare of a patient
or patients), and which affects (or may affect) adversely the clinical
privileges, or membership in a professional society, of the physician.

42 U.S.C. § 11151(9).[32]

The Act further defines "professional review activity" as

an activity of a health care entity with respect to an individual physician—

(A) to determine whether the physician may have clinical privileges with

_____

[31] However, there is no immunity under the HCQIA from state or federal
discrimination claims. 42 U.S.C. § 11111. ("[Immunity] shall not apply to damages under
any law of the United States or any State relating to the civil rights of any person or
persons, including the Civil Rights Act of 1964, 42 U.S.C. 2000e, *et seq*., and the Civil
Rights Acts, 42 U.S.C. 1981, *et seq.*"  42 U.S.C. § 11111.

[32] A "professional review body" is "a healthcare entity and the governing body or
any committee of a health care entity which conducts professional review activity, and
includes any committee of the medical staff of such an entity when assisting the
governing body in a professional review activity."  42 U.S.C. § 11151(11).  Thus, in this
case, St. Mary Mercy Hospital, the PI Committee, the MEC, and the Board are
considered "professional review bod [ies]."  *See Talwar v. Mercer County Joint Twp.
Community Hosp.* 520 F. Supp. 2d 894, 899 (N.D. Ohio 2007).  The statutory definition
does not require the committee to be formal, appointed or elected, or  retain the same
members.  *See Wojewski v. Rapid City Regional Hosp.*, *Inc.*, 730 N.W. 2d 626, 634 (S.D.
2007). Thus, the term "professional review body" also encompasses an informal group of
doctors "when assisting the governing body in a professional activity." *Id.*

respect to, or membership in, the entity;

(B) to determine the scope or conditions of such privileges or membership; or

(C) to change or modify such privileges or membership.

*Id*. at § 11151(10).

Participants in a professional review action are entitled to immunity if the

professional review action was pursued:

(1) in the reasonable belief that the action was in furtherance of quality health care;

(2) after a reasonable effort to obtain the facts of the matter;

(3) after adequate notice and hearing procedures are afforded to the physician involved or after such other procedures as are fair to the physician under the circumstances; and

(4) in the reasonable belief that the action was warranted by the facts known after such reasonable effort to obtain facts and after meeting the requirement of paragraph (3).

42 U.S.C. § 11112(a).

Once these standards have been satisfied, the HCQIA offers immunity to:

(A) the professional review body,
(B) any person acting as a member or staff to the body,
(C) any person under a contract or other formal agreement with the body, and
(D) any person who participates with or assists the body with respect to the action.

42 U.S.C. § 11111(a)(1).

As the Sixth Circuit has noted, "[t]he HCQIA creates a rebuttable presumption of immunity, forcing the plaintiff to prove that the defendant's actions did not comply with the relevant standards." *Meyer, supra* 341 F.3d at 467–68 (quoting *Id*. § 11112(a)). The HCQIA's rebuttable presumption of immunity results in "an unusual summary judgment" standard under which a court must ask whether "a reasonable jury, viewing the facts in the best light for the plaintiff, [could] conclude that he has shown, by a preponderance of the evidence, that the defendants' actions are outside the scope of § 11112(a)." *Id*.

In determining whether a professional review action meets the criteria of § 11112(a), the courts apply "an objective standard, rather than a subjective good faith requirement." *Id*. at 468.  As such, any bad faith or hostility on the part of those participating in the review action is irrelevant. *Mathews v. Lancaster Gen. Hosp*., 87 F.3d 624, 635 (3d Cir.1996);  *Bryan v. James E. Holmes Reg. Med. Ctr*., 33 F.3d 1318, 1335 (11th Cir. 1994), *cert. denied*, 514 U.S. 1019 (1995); *Austin v. McNamara*, 979 F.2d 728, 734 (9th Cir. 1992).  Whether a defendant is entitled to immunity under the Act is a question of law for the court to decide whenever the record is sufficiently developed. *Bryan, supra* 33 F.3d at 1332.

As indicated, a professional review action is presumed to satisfy HCQIA's four-factor reasonableness test for immunity unless rebutted by a preponderance of the evidence. 42 U.S.C. § 11112(a); *Moore v. John Deere Health Care Plan, Inc.*, 2012 WL 3024012 at *6 (6th Cir., July 25, 2012).  A professional review action is entitled to

63

immunity if taken: (1) in the reasonable belief that the action was in furtherance of quality health care; (2) after a reasonable effort to obtain the facts of the matter; (3) after adequate notice and hearing procedures are afforded to the physician involved or after such other procedures as are fair to the physician under the circumstances; and (4) in the reasonable belief that the action was warranted by the facts known after such reasonable effort to obtain facts and after meeting the requirement of paragraph (3). 42 U.S.C. § 11112(a).  Having reviewed each of the four prongs, the Court concludes that Plaintiff Brintley has failed to satisfy her burden of rebutting the presumption of HCQIA immunity.

The first prong of the test -- whether Defendants reasonably believed that the action taken was in furtherance of quality health care -- is met "if the reviewers, with the information available to them at the time of the professional review action would reasonably have concluded that their action would restrict incompetent behavior or would protect patients." *Badri v. Huron Hospital*, 691 F. Supp. 2d 744, 765 (N.D. Ohio 2010) (quoting *Bryan v. James E. Holmes Reg. Med. Ctr.*, 33 F.3d 1318. 1323 (11th Cir. 1994) (internal citations omitted).)  *See also Brader v. Allegheny General Hospital*, 167 F.3d 832, 840 (3d Cir.1999).  In effect, all that needs to be shown to satisfy this prong is that the hospital reasonably believed that some action was warranted.  *Imperial v. Suburban Hospital*, 37 F.3d 1026, 1030 (4th Cir.1994).

In this case, the inquiry into Plaintiff's quality of care was triggered by the near

death of an otherwise healthy 22-year-old woman during a routine laparoscopic appendectomy caused by Dr. Brintley's laceration of two of the woman's major blood vessels when she blindly inserted a bladed trocar -- a procedure disfavored at SMMH -- into the woman's abdomen. Concerned about the magnitude of the injury, SMMH's Chief Medical Officer, met with the Chair of the Department of Surgery and the hospital's Chief of Staff, and they agreed that, in order to determine whether corrective action was warranted, a study of Dr. Brintley's charts of appendectomies and cholocystectomies performed by her and her surgical complication rate should be conducted.

A review of the 104 surgical procedures performed by Dr. Brintley during her 13-month tenure at SMMH revealed that there were complications in 13 cases. Multiple internal reviews of these 13 cases showed significant problems with Plaintiff's quality of care, including six avoidable surgical complications over the 13-month period. A statistical comparison of avoidable complications occurring in appendectomies and cholecystectomies performed at SMMH over the same time period showed that Plaintiff had a significantly higher avoidable complication rate than any other general surgeon on the SMMH medical staff. After the PI Committee reviewed Plaintiff's charts and the comparison of Plaintiff's complication rate to that of the other general surgeons, a report of the Committee's findings was prepared and submitted to the MEC. Based on the PI Committee's findings and report, the MEC concluded that Dr. Brintley should be

required to undergo a proctorship.

A proctorship was established. However, Dr. Brintley repeatedly resisted and refused to follow directives of the proctors. An outburst during a proctored surgery in August 2008 precipitated a PEERs report from a head surgical nurse which related that Dr. Brintley's refusal to follow directives and argumentative outburst "caused tremendous stress on the surgical team" and "great concern for the well being and safety of the patient." This report, along with the Surgical Chair's report of Brintley's overall proctorship experience, was subsequently submitted to the MEC. Based upon these reports, and after affording Plaintiff a hearing on the matter, the MEC voted to suspend Dr. Brintley's privileges. After a four-day Peer Review Hearing, a panel of five physicians upheld the suspension.

The foregoing demonstrates that Defendants instituted the proctorship and ultimately suspended Dr. Brintley's surgical privileges because they had reasonable concerns about her ability to provide quality health care and to behave in a professionally acceptable manner.

Dr. Brintley has failed to show by a preponderance of the evidence that the actions of the Defendants were not taken in the reasonable belief that the action was in furtherance of quality care. All that Plaintiff offers as "evidence" that Defendants' actions were not in furtherance of quality care is her subjective belief that the actions were taken specifically to terminate her. This is evidenced, in Plaintiff's view, by her

66

allegation that "Dr. Gokli asked for her resignation prior to any comparables being gathered." *See* Plaintiff's Response Brief, p. 54. Plaintiff does not cite to any portion of the voluminous record of this matter as support for this allegation. This is not surprising inasmuch as the record, including Plaintiff's own testimony at the Peer Review Hearing, refutes it.

Plaintiff testified at the hearing that she was called to meet with Drs. Gokli, Misirliyan and Roc on February 11, 2008, ***after*** there had been a review of some of her cases, and that that review showed she had a complication rate three times higher that the other surgeons for appendectomies and cholecystectomies. *See* 3/14/09 Hrg. Tr. Vol. IV, p. 876. She further testified, "After that, I was told that you should look at your future, *we want you to -- **you have three options**. You resign from the staff of the hospital, you take a leave of absence or you get summarily suspended from the hospital.*" *Id.* at 876-77 (emphasis added). None of the doctors specifically called for Plaintiff's resignation. *See also*, Hearing Testimony of Dr. Misirliyan, Hrg. Tr. Vol. II:

> Q: If you look down [in Dr. Roc's memo] it references that Dr. Brintley took a leave of absence through March 15th, 2008. Do you see that?
>
> A: Uh-huh. Yes.
>
> Q: Do you recall how that came about?
>
> A: Well, prior to that I had met with Dr. Gokli, he's VP of Medical Affairs, and with the Chief of Surgery, Dr. Roc. And at that point, Med Exec Committee meeting was coming up and we had asked [Dr. Brintley] to consider her options before that meeting, and she had taken a voluntary leave of absence. And during that time we were asking the QA Committee

67

to take a deeper dive of the issues that had arisen to try to --

Q: Yeah. I'll get to that in a minute. If I could just ask you then what was the reason that to your knowledge that she was asked to take the leave of absence?

A: Well, you know, specifically, I don't know that we asked her to take the leave of absence. We gave her options.

[3/12/09 Hrg. Tr., Vol. II, pp. 509-10.]

There is no merit to Plaintiff's contention that Defendants demanded her resignation before any review of her cases was done. Being offered, as one of three options, the option to resign is not a demand for her resignation. In any event, nothing in the record supports Plaintiff's contention that Defendants did not reasonably believe that the actions taken were in furtherance of quality health care.

The second requirement under 42 U.S.C. § 11112(a) is: "[the] professional review action must be taken . . . after a reasonable effort to obtain the facts of the matter." 42 U.S.C. § 11112(a)(2). The inquiry for this requirement "is whether the 'totality of the process' leading up to the professional review action evinced a reasonable effort to obtain the facts of the matter." *Meyers, supra*, 341 F.3d at 469 (quoting *Mathews v. Lancaster Gen. Hosp.*, 87 F.3d 624, 637 (3d Cir.1996)). As demonstrated above, before imposing the proctorship, Defendants examined Plaintiff's charts of surgeries she performed during the 13 months she operated at SMMH and compared her complication rate on appendectomies and cholecystectomies to the rates of all of the other general surgeons who operated at SMMH. And, before ultimately deciding to suspend Plaintiff's

68

privileges, the MEC considered the reports of the proctors and the PEERs report of the

surgical nurse. Defendants further heard Plaintiff's explanation of the cases and Plaintiff

was afforded the opportunity to bring to the attention of the MEC and the Peer Review

Hearing panel any other relevant evidence.  Based upon the foregoing, the Court

concludes that Defendants made a reasonable effort to obtain the facts of the matter.

In rebuttal, Plaintiff argues that Defendants failed to risk adjust her cases in

making the comparison of her complication rate to that of the other SMMH doctors. She

further contends that the reports of her proctorship were flawed and should not have been

considered because her proctoring "proceeded on completely different terms than any

other proctorship in SMMH history."  *See* Plaintiff's Response Brief, p. 55.  However,

Plaintiff "was entitled to a *reasonable* investigation, not a *perfect* one."  *Poliner v. Texas*

*Health Systems*, 537 F.3d 368, 380 (5th Cir. 2008), *cert. denied*, 555 U.S. 1149 (2009)

(emphasis in original); *Singh v. Blue Cross/Blue Shield of Mass., Inc.*, 308 F.3d 25, 43

(1st Cir. 2002). Plaintiff has not shown by a preponderance of the evidence that

Defendants failed to undertake a reasonable effort to obtain the facts.

The third requirement under 42 U.S.C. § 11112(a) is: "[the] professional review

action must be taken . . . after adequate notice and hearing procedures are afforded to the

physician involved or after such other procedures as are fair to the physician under the

circumstances." 42 U.S.C. § 11112(a)(3).[33] Significantly, however, "a professional

---

[33] Adequate notice and hearing is described in 42 U.S.C. § 11112(b), which, in
pertinent part, provides:

_____

(b) Adequate notice and hearing. A health care entity is deemed to have met the adequate notice and hearing requirement . . . if the following conditions are met:

(1) Notice of proposed action. The physician has been given notice stating-

    (A)    (i) that a professional review action has been proposed to be taken against the physician,
           (ii) reasons for the proposed action,

    (B)    (i) that the physician has the right to request a hearing on the proposed action,
           (ii) any time limit (of not less than 30 days) within which to request such a hearing, and

    (C) a summary of the rights in the hearing. . . .

(2) Notice of hearing. If a hearing is requested. . . , the physician involved must be given notice stating-

    (A) the place, time, and date, of the hearing . . . , and

    (B) a list of the witnesses (if any) expected to testify at the hearing on behalf of the professional review body.

(3) Conduct of hearing and notice.

* * *

    (C) in the hearing the physician involved has the right-

        (i) to representation by an attorney or other person of the physician's choice,
        (ii) to have a record made of the proceedings . . . ,
        (iii) to call, examine, and cross-examine witnesses,
        (iv) to present evidence determined to be relevant by the hearing officer, regardless of its    admissibility in a court of law, and
        (v) to submit a written statement at the close of the hearing. . . .

70

review body's failure to meet the conditions described in this subsection shall not, in itself, constitute failure to meet the standards of subsection (a)(3)." *Id.* § 11112(b).

Plaintiff does not dispute that she received due notice and was provided hearings before both the MEC and the Peer Review panel.  She complains, however, that she had requested discovery from the hospital of certain materials she claims she needed to defend her actions, but had not been provided with the materials prior to January 22, 2009 start of the Peer Review hearing.  Plaintiff's Brief, p. 56.  (She admits, however, that she was provided the materials before the hearing resumed for its second day on March 12, 2009.)

In any event, Plaintiff had ample opportunity at the Peer Review Hearing to object to not having been provided copies of pertinent materials before the start of the hearing, and, in fact, through counsel, she took advantage of that opportunity.  *See* 1/22/09  Hrg. Tr., Vol. I, p. 9 (objecting to not having been provided with a copy of a PEERs report she herself had submitted to SMMH).  Furthermore, Plaintiff herself brought to the Hearing Panel's attention that she had not been provided information she had requested:

> Q [by Plaintiff's counsel]:  So at that time [when you met with Drs. Roc, Gokli and Misirliyan], you did not protest a review of your cases. You simply said go ahead and do your review but I would like to be able to

---

A professional review body's failure to meet the conditions described in this subsection shall not, in itself, constitute failure to meet the standards of subsection (a)(3).

42 U.S.C. § 11112(b).

continue to work to support my family?

A:      Absolutely, yes.

Q:      Okay. And you had asked for the calculations, the methodology for how this alleged three times more than other surgeon complication rate had been arrived at?

A:      Yes.

[3/14/09 Hrg. Tr., Vol. IV, p. 878.]  *See also*, pp. 926-27 (testifying about her attorney's

4/16/08 letter to SMMH):

Q:      All right. In addition to requesting an appeal of the recommended adverse action, was there also a request for documentation in support of the corrective action?

A:      Yes.

Q:      Okay. If you look at the third paragraph on the first page, this contains the document request?

A:      Yes.

Q:      Okay. Why was this information important to you?

A:      This was important because I had not had an opportunity to clearly identify what patients, what concerns, what issues were addressed to make the decision for me to have the proctorship.  And as a result, I had asked for clarity for how or what were the concerns and what patients were involved with those concerns so that I could fully understand what the charges were against me to the MEC.

*Id*. at pp. 926-27.

The hearing panel, therefore, was made aware that Plaintiff had not received

discovery she had requested prior to the start of the hearing.  And, inasmuch as Plaintiff

admits that she ultimately did receive requested materials before the second day of the four-day hearing, she cannot complain that she was not afforded adequate notice and hearing procedures.

The fourth, and final, requirement under 42 U.S.C. § 11112(a) is that "[the] professional review action must be taken . . . in the reasonable belief that the action was warranted by the facts known after such reasonable effort to obtain facts and after meeting the [adequate hearing and notice] requirement." 42 U.S.C. § 11112(a)(4).  Based on their similarities, analysis under 42 U.S.C. § 11112(a)(4) "closely tracks" analysis under 42 U.S.C. § 11112(a)(1). *Meyers, supra*, 341 F.3d at 471 (quoting *Gabaldoni v. Washington County Hosp. Ass'n*, 250 F.3d 255, 263 n. 7 (4th Cir.2001)).  In making this determination, the Court is not to reweigh the evidence or substitute its own judgment for that of the decisionmaker.  *Bryan, supra* 33 F.3d at 1337.  Plaintiff's burden, thus, is to show that the "facts were so obviously mistaken or inadequate as to make reliance on them unreasonable."  *Meyers, supra*.

As the preceding discussion demonstrates, SMMH's MEC thoroughly reviewed Plaintiff's case before issuing its final decision, and the decision was upheld by the Peer Review Hearing panel.  Plaintiff has failed to demonstrate that this decision was not made in the reasonable belief that the action was warranted by the facts known after such reasonable effort to obtain facts and after meeting the adequate hearing and notice requirements of § 11112(b).

The Court having determined that Plaintiff has failed to produce evidence from which a reasonable jury could conclude that Defendants did not meet the requirements of the Act, the Court finds that Defendants are immune from liability on Plaintiff's state law claims in this action.[34]

## J.   ON THE MERITS, PLAINTIFF'S STATE LAW CLAIMS FAIL

Even if Defendants were not immune from liability on Plaintiff's state law claims, those claims, nonetheless, lack merit.

### 1.   Tortious Interference with Business Expectancies/Relationships

In Count VIII, Plaintiff alleges that "by unlawfully terminating Plaintiff's medical staff privileges at SMMH, Defendant SMMH intentionally interfered with Plaintiff's [relationships and/or expectancies with her patients and referral sources for the continued provision of general surgery services to her current and prospective patients]." Complaint, ¶¶ 86, 90.

To make out a claim for tortious interference with business expectancies or

---

[34] Defendants are also immune under the Michigan Peer Review Statute. The Michigan statute cloaks a "person, organization or entity" with immunity *unless it is shown that the person, organization or entity acted with malice*. *See* M.C.L. § 331.531(3), (4) (emphasis added). "Malice can be established when a 'person supplying information or data [to a peer review entity] does so with knowledge of its falsity or with reckless disregard of its truth or falsity. Similarly, a review entity is not immune from liability if it acts with knowledge of the falsity, or with reckless disregard of the truth or falsity, or with reckless disregard of the truth of information or data. . . upon which it acts." *Feyz v. Mercy Memorial Hospital*, 475 Mich. 663, 667, 719 N.W. 2d 1, 4 (2006). Plaintiff here has not demonstrated malice on the part of any of the Defendants so as to exempt them from the immunity afforded them under Michigan law.

relationships, a plaintiff must prove (1) the existence of a valid business relationship or expectancy, (2) the defendant's knowledge of the relationship or expectancy, (3) the defendant's intentional interference by inducing or causing breach or termination of the relationship or expectancy, and (4) damages resulting to the party whose relationship or expectancy was disrupted. *Health Call of Detroit v. Atrium Home & Health Care Services, Inc*., 268 Mich. App 83, 90; 706 NW2d 843 (2005). The interference must be improper, meaning that it lacked justification. *Advocacy Org. for Patients & Providers v. Auto Club Ins*., 257 Mich. App 365, 383; 670 NW2d 569 (2003). "The 'improper' interference can be shown either by proving (1) the intentional doing of an act wrongful *per se*, or (2) the intentional doing of a lawful act with malice and unjustified in law for the purpose of invading plaintiff's contractual rights or business relationship." *Id.* However, where, as here, the Defendants' actions were motivated by legitimate business reasons, their actions cannot constitute improper motive or interference. *Dalley v. Dykema Gossett*, 287 Mich. App 296, 324; 788 N.W. 2d 679 (2010). As detailed throughout this Opinion, there is simply no showing on this record of malice or improper motive, or any other improper considerations; to the contrary, the record establishes only that Defendants' actions were motivated by the legitimate business judgments and rationale of those responsible for insuring that the hospital was providing quality health care to its patients.

2. <u>Violation of Public Policy</u>

75

In Count X, Plaintiff purports to assert a claim of wrongful discharge in violation of public policy predicated upon standards of the "Joint Commission on Accreditation of Healthcare Organizations," with whom SMMH sought and obtained accreditation, thereby allowing it to receive Medicare and Medicaid reimbursement. *See* Complaint, ¶ 98.

In Michigan, employment is presumptively terminable at the will of either party. *Kimmelman v. Heather Downs Mgt. Ltd.*, 278 Mich. App. 569, 572, 753 N.W.2d 265, *app. denied*, 482 Mich. 989 (2008). Accepting for the present purposes Plaintiff's claim that she was an "employee," Plaintiff does not dispute that she was an at-will employee. Thus, her employment was terminable at will for any reason or no reason, unless termination was prohibited by statute or was contrary to public policy. *Id.* at 572-573, 753 N.W.2d 265. Public policy proscribes termination of employment where the termination decision is motivated by one of three situations: (1) the employee acted in accordance with a statutory right or duty; (2) the employee failed or refused to violate a law in the course of employment; or (3) the employee exercised a right conferred by a well-established legislative enactment. *Id.* at 573, 753 N.W.2d 265.  No legal or statutory right is set forth in the JCAHO standards, nor do the standards constitute any "right conferred by well-established legislative enactment."  Thus, Plaintiff cannot establish a cause of action here.

3.    Breach/Violation of Duty of Care

Plaintiff's Count XI for "breach/violation of duty of care" sounds in negligence. However, Plaintiff has failed to articulate any cognizable legal duty owed her by SMMH as a physician with staff privileges that was breached by SMMH.  To the extent that Plaintiff alleges that Defendants were negligent in their evaluation of, and investigation into, her surgical complications, such an allegation clearly implicates the hospital's peer review action.  And, it is well-settled that HCQIA does not provide for a private cause of action by a physician for negligence in the peer review. *See Singh v. Blue Cross/Blue Shield,* supra, 308 F.2d at 45 n.8; *Wayne v. Genesis Med. Ctr.*, 140 F.3d 1145, 1148 (8th Cir.1998); *Bok v. Mut. Assur.*, 119 F.3d 927, 928-29 (11th Cir.1997), *cert. denied*, 523 U.S. 1118 (1998); *Badri v. Huron Hospital,* 691 F. Supp. 2d 744, 769 (N.D. Ohio 2010).

As for Plaintiff's "duty to protect someone who is endangered by a third-party's conduct," the indicia necessary for imposing a duty based on a "special relationship" are plainly absent.  Michigan courts have recognized that certain types of special relationships, such as common carriers and their passengers, innkeepers and their guests, and doctors and patients, justify the imposition of a duty because a person entrusts himself or herself to the control of another person.  In *Hill v. Sears, Roebuck and Co.*, 429 Mich. 651, ___ N.W. 2d ___ (Aug. 16, 2012), the Michigan Supreme Court explained the rationale behind imposing a duty in such situations:

> Social policy . . . has led the courts to recognize an exception to th[e] general rule [that there is no duty that obligates one person to aid or protect another] where a special relationship exists between a plaintiff and a defendant. . . . The rationale behind imposing a duty to protect in these

special relationships is based on control. In each situation one person entrusts himself to the control and protection of another, with a consequent loss of control to protect himself. The duty to protect is imposed upon the person in control because he is best able to provide a place of safety.

*Id.* (quoting *Williams v. Cunningham Drug Stores, Inc.*, 429 Mich. 495, 499, 418 N.W. 2d 381, 383 (1988).

Contrary to Plaintiff's assertion, no such "special relationship" was created by Defendants' proctorship of Plaintiff.

<u>CONCLUSION</u>

For all of the foregoing reasons,

IT IS HEREBY ORDERED that Defendants' Motion for Summary Judgment **[Dkt. # 87]** be, and hereby is, GRANTED.

IT IS FURTHER ORDERED that Plaintiff's post-summary judgment Motion to Strike Defendants' Expert **[Dkt. # 137]** is DENIED, as moot.

Let Judgment be entered accordingly.

Dated:  November 16, 2012          s/Gerald E. Rosen_____
                                   Chief Judge, United States District Court

I hereby certify that a copy of the foregoing document was served upon counsel of record on November 16, 2012, by electronic and/or ordinary mail.

                                   s/Shawntel R. Jackson for Ruth A. Gunther
                                   Case Manager